BOWLES, Adm'r, Office of Price Administration, v. GLICK BROS. LUMBER CO. et al.

No. 10664.

Circuit Court of Appeals, Ninth Circuit.

Jan. 4, 1945.

Rehearing Denied March 26, 1945.

Thomas I. Emerson, Deputy Adm'r for Enforcement, Fleming James, Jr., Director, Litigation Division, David London, Chief, Appellate Branch, Albert Dreyer, Atty., OPA, all of Washington, D. C., W. Dunlap Cannon, Jr., Regional Litigation Atty., of San Francisco, Cal., and H. Eugene Breitenbach, Dist. Enforcement Atty., OPA, of Los Angeles, Cal., for appellant.

Morris Lavine, of Los Angeles, Cal., for appellees.

Morgan J. Doyle, of San Francisco, Cal., as amicus curiae.

Before WILBUR, DENMAN, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The Administrator of the Emergency Price Control Act of 1942, 50 U.S.C.A. Appendix, § 901 et seq., appeals from a judgment of dismissal of a suit brought in October, 1943, under § 205(e) of the Act. The appeal involves, also, an interlocutory order suppressing evidence obtained by OPA investigators preliminary to the institution of the suit.

Defendant Glick Brothers Lumber Company is a California corporation. The remaining defendants are its stockholders. Two counts of the complaint alleged that during the year ending September 30, 1943 the defendants sold lumber at wholesale at prices in excess of those permitted by the General Maximum Price Regulation. A third count alleged the wholesaling of lumber during the same period at prices in excess of those permitted by Regulation

No. 215. It was averred that none of the lumber was purchased by the buyers for use or consumption other than in the course of trade or business. Judgment was asked in the sum of $34,695.18, being treble the amount by which the prices charged exceeded the maximum prices permissible.

1. Briefly summarized, the grounds announced by the court for sustaining defendants' motion to dismiss were that the Administrator is not empowered to maintain the suit; that the complaint is not sufficiently definite to inform the defendants of the facts constituting the basis of the Administrator's claim; and that the evidence upon which the action is based was obtained in violation of the Fourth and Fifth Amendments to the Constitution of the United States.

■ Indefiniteness of the complaint is not a ground for dismissal. If a defendant needs additional information to enable him to answer or prepare for trial the procedure provided by the Federal Rules is a motion for a more definite statement or for a bill of particulars, consult Rule 12(e), 28 U.S.C.A. following section 723c. Nor, in a civil action, does illegality of the means by which evidence has been procured afford grounds for a motion to dismiss. The defenses which may be interposed by motion are confined to those enumerated in Rule 12(b).

The trial court was of opinion that under § 205(e) of the Act the right to bring suit for damages against one regularly engaged in business "is exclusively the right of the individual or concern having to pay the overcharge, and the Administrator has no right to sue in such instance but is limited in his right to bring actions for treble damages to suits against black market operators and bootleggers and others not regularly engaged in business." The court conceded that this view "may not be consistent with the strict words of the section," but it believed that the construction "saves the statute from invalidity."

■ We think the Administrator was entitled to maintain the suit. Section 205 (e) of the 1942 Act, so far as here pertinent, reads: "If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, *the person who buys such commodity for use or consumption other than in the course of trade or business* may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. * * * If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, and the buyer is not entitled to bring suit or action under this subsection, the Administrator may bring such action under this subsection on behalf of the United States." (Emphasis supplied.)

■■ The Section is to be read in conjunction with § 4(a). The latter makes it unlawful for any person to sell, or in the course of trade or business to buy a commodity for a price in violation of any regulation or price schedule, that is to say, the buyer in the course of trade or business is deemed by the statute to be in pari delicto with the seller. But one who buys for use or consumption other than in the course of trade or business—the ordinary non-commercial consumer—is not declared a violator. He is apparently thought to possess no choice in the matter. Hence he is the only member of the buying public empowered under § 205(e) to bring suit for treble damages. In all other cases the right vests in the Administrator for the use and benefit of the Nation as a whole.[1]

Such is the legislative policy charted by the statute with reasonable clarity. That the phrase "trade or business" was intended by Congress to carry the meaning here ascribed to it is amply borne out by the legislative history of the Act.[2] Senate Report 931, p. 8 (77th Cong., 2d Sess.), states that § 205(e) "will permit private pur-

---

[1] This appears to have been the interpretation of the Act adopted by the district courts in the bulk of the cases so far decided, cf., for example: Bowles v. Chew, N.D.Cal., 53 F.Supp. 787. According to the Administrator there have been more than a hundred cases in which those courts, either directly or by implication, have upheld the construction heretofore indicated. A dozen or more of the decisions are cit-ed, but they do not appear to have been reported as of the date of the filing of the briefs.

[2] The contemporaneous administrative interpretation (OPA Service 11:804) defines the phrase as having relation to purchases by industrial and commercial consumers as well as to purchasers for resale, that is, in general, to buyers engaged in a commercial activity for profit.

chasers who buy for personal use or consumption rather than in the course or trade or business, to protect themselves against violations of the Act." Again, on p. 26 of the Senate Report it is said that "if a buyer, whose seller has violated a maximum price regulation or price schedule is not entitled to bring such action, because he is a buyer in the course of trade or business, or for other reasons the Administrator may bring such action against the seller on behalf of the United States." The Senate draft of § 205(e) was not changed in Conference, and was enacted as it originally stood. The Conference Report (No. 1658) states at· p. 26 that "non-commercial consumers might institute treble damage suits."

2. We consider now the order suppressing the evidence.

The motion to suppress (supported by affidavits of several officers and employees of the Lumber Company) was grounded in the claim that the evidence had been obtained by an unlawful search and seizure. Affidavits of the investigators of the Office of Price Administration were interposed in opposition to the motion. Although the investigators were present in court and the Administrator several times suggested that they be heard orally, the court declined to consider anything other than the affidavits. It adopted as true the contents of those submitted on behalf of the defendants.

While for the most part the affidavits are in sharp conflict, the following facts are substantially undisputed: On June 1, 1943, Christiansen and Vettel, the OPA investigators, called at the Lumber Company's place of business, displayed their credentials, and asked permission of the general manager, Max Glick, to inspect the invoices. The invoices were made available and a room in the building was assigned to the investigators in which to conduct the examination. The inspection continued during the period from June 1 to June 15, and from July 26 to August 15, 1943. There were thereafter a few sporadic visits up until September 15. No objection was made to the examination of invoices until August 13, on which date the defendants served on the investigators and and on the Office of Price Administration a notice objecting to the investigation as an illegal search and seizure.[3] Up until that time, from all accounts, the inspection appears to have been conducted with the acquiescence of the defendants. On one phase only is there disagreement. Certain invoices and delivery slips, said to contain alterations and interlineations which could not be accurately shown by the ordinary process of copying, were taken out of the building and photostatic copies made of them. The originals were customarily returned promptly thereafter. The defendants assert that the removal and photostating was done without their knowledge or consent. However, the investigators state that these photostatic copies were produced and discussed in detail at conferences held from time to time with the defendants and their counsel and no objections were raised as to the fact or manner of their procurement.

The investigators say that leave to inspect invoices was freely given and that the relations between themselves and the defendants were at all times friendly and cooperative. This the defendants deny. Their affidavits are to the effect that the invoices were made available only because the defendants were told by the investigators that things would otherwise be made "awfully tough" for them, and because they—the defendants—were "inspired by fear and apprehension of the great and almost unlimited power of the Office of Price Administration and of its officers and agents." Defendants thought they were under compulsion and feared that "serious and dire consequences" would ensue if they failed to permit the requested examination.

In large measure the affidavits relate, not to the inspection itself, but to a series of interviews had between the defendants and their representatives on the one hand and representatives of the Office of Price Administration on the other. All these took place during the progress of the investigation. From the time of the first conference the defendants were represented by counsel. During the conferences, it is asserted, the representatives of the OPA conducted themselves in a high handed manner, demanding sums varying from $25,000 to $90,000 on account of alleged liability of the defendants for violations of the Act.[4] These demands, along with the

---

[3] A second and similar notice was served on September 10, 1943.

[4] It is undisputed that in July, when the examination was partially completed, the defendants, in writing, appointed one Young as their attorney in fact "to carry on all negotiations with the OPA in our behalf" relating to the claims being made

intimidating attitude of the OPA representatives, caused the Lumber Company's officers to suffer serious physical and nervous shocks. On the other side, all allegations as to intimidation and coercion are flatly denied.

We will not further analyze the affidavits. Those of the individual defendants are neither forthright nor clear; as regards the matter of consent, their contents are vague and argumentative to the point of evasiveness. Assuming that the threats of dire consequences were made as charged, it is hardly credible that these experienced businessmen, with counsel at their elbow, understood them in any other sense than that statutory sanctions would be invoked or legal steps taken to compel the production of the sales records if voluntary access to them were refused.

We turn to the relevant provisions of the Act. Section 2 authorizes the Price Administrator to establish such maximum prices as in his judgment will be generally fair and equitable and will effectuate the purposes of the legislation. Section 202 (b) provides, in part, that "the Administrator is further authorized, by regulation or order, to require any person who is engaged in the business of dealing with any commodity, * * * to make and keep records and other documents, and to make reports, and he may require any such person to permit the inspection and copying of records and other documents, * * *. The Administrator may administer oaths and affirmations and may, whenever necessary, by subpena require any such person to appear and testify or to appear and produce documents, or both, at any designated place."

On April 28, 1942, a General Maximum Price Regulation was issued under § 2 of the Act. Section 1499.2 of this regulation established the maximum prices which a seller might lawfully charge for any of the commodities subject to the regulation at the highest prices charged therefor by the seller during March 1942.[5]

Section 1499.11 of the General Regulation requires the seller to preserve for examination by the Office of Price Administration all his existing records relating to the prices which he charged during March 1942, and his offering prices for that month, and to prepare, on or before July 1, 1942, on the basis of all available information, and thereafter keep for examination by any person during ordinary business hours, a statement showing his highest prices as of March 1942, and his offering prices as of that month, as well as his customary allowances, discounts and other price differentials.[6]

By § 1499.12 every seller of commodities for which maximum prices have been established is required to "keep and make available for examination by the Office of Price Administration, records of the same kind as he has customarily kept, relating to the prices which he charged for such of those commodities or services as he sold after the effective date of this regulation; and, in addition, records showing, as precisely as possible, the basis upon which he determined maximum prices for those commodities or services." Section 1499.13, not necessary to be noticed in detail, requires dealers in cost-of-living commodities to post their ceiling prices conspicuously in their places of business and on the commodity itself or its container.

Price Regulation 215, issued under § 2 of the Act, establishes the maximum prices which may lawfully be charged by distribution yards for certain species of lumber or lumber products at the mill prices therefor, which are fixed by separate regulations, plus specified mark-ups. Section 17 of this Regulation reads, in part: "All distribution yards must keep records which will show a complete description of the items of lumber sold (i. e. grade, condition of dressing, quantity, etc.), the name and address of the buyer, the date of the sale and the price for a period of two years * * *."

It is thus seen that dealers are required by the Act to keep such informative records as the Administrator may direct and to permit the Administrator, upon request, to inspect and copy them. These requirements are an essential part of the Congressional scheme of price stabilization and control. It is hard to see how the purposes of this vital wartime legisla-

---

on account of overcharges, and that Young made an offer to pay $25,000 in settlement.

[5] The commodities affected by the Regulation included certain species of lumber and lumber products.

[6] This section contains provisions designed to protect dealers other than retailers from injury resulting from disclosures to members of the general public.

tion could be achieved without them. To effect the end desired Congress clothed the Administrator with regulatory and investigatory powers commensurate with his responsibilities, arming him both with authority to inspect and with the power of subpena. The regulations on the subject are in harmony with the statute. The records inspected and copied in this instance were of the type required to be kept and to be made available for inspection. They were not private books and papers of the kind involved in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, and like cases. They were quasi-public records.

In Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912 D, 558, the Court pointed out the distinction, in the matter of privilege, between private papers or records and those of a public or quasi-public nature, saying that in the case of public records and official documents the officer in possession of them is not justified in resisting inspection, even though the record was made by himself and would supply evidence of his criminal dereliction. "The principle," said the Court, 221 U.S. at page 380, 31 S.Ct. at page 544, "applies not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established." Continuing its analysis of the precedents (221 U.S. at pages 381-382, 31 S. Ct. at page 545) the Court said that "the fundamental ground of decision in this class of cases is that where, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him. In assuming their custody he has accepted the incident obligation to permit inspection."

The distinction drawn in the Wilson case has been consistently observed by the Federal courts. Thus in Rodgers v. United States, 138 F.2d 992, 996, the Court of Appeals of the Sixth Circuit upheld substantially identical investigatory provisions contained in the Agricultural Adjustment Act of 1938, 7 U.S.C.A. § 1281 et seq., observing that "the records and reports required by the statute and regulations here in question are quasi-public documents and not for appellant's private use." To similar effect see Fleming v. Montgomery Ward & Co. 7 Cir., 114 F.2d 384 (involving the Fair Labor Standards Act, 29 U.S. C.A. § 201 et seq.); United States v. Mulligan, D.C., 268 F. 893 (involving the record keeping and inspection requirements of the Lever Act); A. Guckenheimer & Bros. Co. v. United States, 3 Cir., 3 F.2d 786.

■ The existence of probable cause for believing that the Act has been violated is not made a prerequisite to inspection, cf. Fleming v. Montgomery Ward & Co., supra. It must be remembered that the legislation was passed under emergency conditions closely affecting the general welfare. Upon the Office of Price Administration has been imposed the task of seeing to it that the law is complied with by all dealers in essential commodities, and that evasion be sternly checked. There is a presumption of regularity in respect of the proceedings of administrative bodies. Hence it is to be presumed that the Administrator has not acted oppressively or undertaken to pursue investigations where no need therefor is apparent.

■ We conclude that the inspection conducted in this instance was authorized by statute and by valid regulation and that it did not violate any of the rights of the defendants under the Fourth or Fifth Amendments. This is true whether the action be regarded as remedial or penal.

■ Asserting that the right of action has abated by termination of the statute, the defendants move to dismiss the appeal. There is no merit in the motion. By the terms of § 1(b) of the 1942 Act, liabilities incurred prior to the termination date thereof (June 30, 1944) are to remain unaffected, and suits with respect to such liabilities may be prosecuted to conclusion. The provision, so far as we are concerned with it here, was not disturbed by the Stabilization Extension Act of 1944, Public Law 383, 78th Cong., 2d Sess., 58 Stat. 632. The latter amended §. 205(e). In these amendments Congress provided that the changes should apply to pending actions so far as the same concerned purchases in the course of trade or business. It is clear that pending proceedings of that type are to go forward in the way governed by the amendments. Such partial defenses as are afforded by the amendments must be

pleaded and proved by the defendants, hence no occasion exists for changes in the Administrator's pleading.

The judgment of dismissal and the order suppressing the evidence are reversed.