**BOWLES, Price Adm'r, v. BRONSON.**
**Civil Action No. 2438.**

District Court, D. Oregon.

May 17, 1945.

Jerome S. Bischoff, Chief, Lumber Enforcement Unit, Norman T. J. McCaffery and James A. Little, District Enforcement Attys., and Victor E. Harr, Asst. U. S. Atty., all of Portland, Or., for plaintiff.

Edwin D. Hicks and Thomas H. Tongue, III, both of Portland, Or., and E. O. Immel, of Eugene, Or., for the defendant.

McCOLLOCH, District Judge.

Courts everywhere are having to consider anew the administrative subpoena power,[1] and I confess that I have been confused in this case, not altogether, I feel, due to my own fault.

I early got the impression in the handling of OPA cases that the OPA made a distinction between the right to examine a defendant's books and records, and an order enforcing that right, where access was denied—a distinction between that, and the conventional administrative subpoena. I have reviewed, during the last few days, some of the earlier cases in this court where the question was discussed by counsel for OPA, and I do not feel like taking all the blame for my own confusion. For instance, I find, in reviewing the file in Northwest Poultry and Dairy Products Company v. Chester Bowles, Adm'r, OPA et al. (Civil No. 2565, an unreported case), that the matter was there presented to me as if it were something different than the conventional subpoena power, but I see, in reading the briefs now before me, that there has been a confusion of terms, that while the document which was served on defendant in the instant case is entitled "Inspection Requirement," signed by Bowles, Administrator, that it is treated as if it were an administrative subpoena of the usual sort.[2]

Whether called "Inspection Requirement" or "Subpoena"—it is called "Inspection Requirement" in the OPA regulations—we are dealing with the question, whether, under the particular circumstances of this case, an administrative subpoena is at this time proper and whether compulsory compliance with it should be ordered. The question is, whether an administrative subpoena is in order after suit has been started. In this case the OPA representatives were permitted by the defendant to have general access to his books and records for a considerable period of time. Then a case was filed against defendant for treble damages which Judge Fee, my colleague, has under consideration. In the case before Judge Fee, he was asked to enter a compliance order enforcing this same subpoena which I have under consideration, the subpoena having been issued after the case was brought. Thereafter this proceeding, denominated a motion to direct defendant to permit inspection of documents, was filed.

The OPA brief states in opening, "At the outset, it may be stated for the sake of argument that perhaps the motion to enforce compliance with the Inspection Requirement was not well brought," in the action before Judge Fee.[3]

[1] The position of OPA attorneys in the many wartime cases in this court has been that the Administrator "need not have a reason nor give a reason," to be entitled to a general order for inspection of books and records. And that the Administrator was entitled to an order of compliance from the court in every case, as a matter of course.

[2] The line of cases known as the "Public Record" or "Quasi Public Record" cases, which seem to strip records kept pursuant to statute or regulation of all immunity under the Fourth Amendment, largely stem from this dictum in Wilson v. United States, 1911, 221 U.S. 361, 380, 31 S.Ct. 538, 544, 55 L.Ed. 771, Ann. Cas.1912D, 558:

"The principle applies not only to public documents in public offices, but also to records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established. There the privilege which exists as to private papers cannot be maintained."

Justice Hughes, the author of the dictum, had been discussing cases where druggists were required to keep records of liquor sales and like situations.

Thirteen years later, in Federal Trade Commission v. American Tobacco Co., 1924, 264 U.S. 298, 44 S.Ct. 336, 68 L. Ed. 696, 32 A.L.R. 786, Justice Holmes did not refer to Wilson v. United States, although it was cited in the briefs.

Some "Public Record" cases: Rodgers v. United States, 6 Cir., 1943, 138 F.2d 992; United States v. Wachtel, D.C., 1945, 59 F.Supp. 910; Bowles v. Glick Bros. Lumber Co. et al., 9 Cir., 1945, 146 F.2d 566; Bowles v. Insel, 3 Cir., 1945, 148 F.2d 91.

It is submitted that under present day legislation—the broadened income tax base, social security, etc.—most adults are required to keep "public records." Compare " * * * it is becoming more and more usual to regulate businesses in cases of public emergency, a phrase which is confessedly exceedingly elastic." United States v. Davis, 2 Cir., 1945, 151 F.2d 140, 142, 2nd col.

[3] Frank avowal has not been made of

"Double shooting" it, OPA then began this separate administrative proceeding, which I think probably constitutes an abandonment, in view of the statement which I have just read, of the attempt to procure compliance in the proceeding before Judge Fee.

So, a case has been begun for treble recovery—$60,000, I believe it is—following an investigation, which was voluntarily consented to by the defendant, covering a considerable period of time; and, after commencement of the case, the Administrator then asked again to be permitted to have access to the same records; this, on the advice of counsel, was declined, and an order is now asked in this proceeding, separate from the action for damages, to compel obedience to the administrative subpoena.[4]

Judge Fee, I understand, expressed some doubt in the main case about the propriety of such a procedure, after the case was brought. What I think he had in mind was the propriety of administrative process after the case was brought, considering the vast powers for discovery available to the Administrator, like any other plaintiff, under the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

In its lowest terms, I believe only a question of discretion is here involved. I do not believe I have to say—and I do not want to say it if I do not have to say it, I do not know that I am prepared to say, that an administrative subpoena could never be served and obedience to it enforced after a case was begun, although both parties are agreed that precedent for such procedure is scarce.[5]

I start with the benefit of Judge Fee's expression of doubt, the treble damage case having been commenced, whether an administrative subpoena for a blanket investigation should be enforced, in view of the broad discovery powers available to the plaintiff in the main proceeding. In this court we have always felt—and I think that is the view generally of judges and the bar —that the discovery procedure under the Federal Rules of Civil Procedure is the most comprehensive to be found in rules or statutes anywhere. I have never known a case in five or six years' work with the Rules where they have proven inadequate. Any party, even for preparation of a case, should find them adequate.

To boil it down, there is nothing that can be obtained by an administrative subpoena that cannot be obtained by deposition after a case has been brought. So, going no further than treating the matter as one involving discretion, I do not see the need for an administrative subpoena at this time, and

---

departure from the great authority of Justice Holmes' decision in Federal Trade Com. v. American Tobacco Co., 1924, 264 U.S. 298, 44 S.Ct. 336, 68 L. Ed. 696, 32 A.L.R. 786. That decision cannot be harmonized with certain recent cases and most of them do not attempt to harmonize it. Some do not cite it. Others distinguish it, and at least one high authority intimates that the decision (1924) and two others (1908, 1915) by the same author are obsolete. See Perkins v. Endicott Johnson Corporation, 2 Cir., 1942, 128 F.2d 208, 216.

Nor has the important constitutional distinction restated by Chief Justice Taft in Essgee Co. v. United States, 1923, 262 U.S. 151, 155, 43 S.Ct. 514, 67 L.Ed. 917, between the rights of corporate defendants and natural persons been maintained. For example, Bowles v. Insel, 3 Cir., 1945, 148 F.2d 91.

The defendant in the instant case is an individual doing business under a trade name. No showing of probable cause was made. As stated, it has been the position of OPA before this court that no showing need be made beyond the Administrator's declaration that he deems it necessary to make a general inspection of records.

[4] Some recent cases take the jump from grand juries and their long established right of inquisition to the limitless right of inquiry claimed by at least one agency, "with the greatest of ease."

Justice Hughes, who wrote the opinion in Wilson v. United States, 1911, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas.1912D, 558, which involved a grand jury investigation, was a member of the court that decided United States v. Louisville & N. R. R., 1915, 236 U.S. 318, 35 S.Ct. 363, 59 L.Ed. 598, a decision severely restrictive of the investigatory powers of the Interstate Commerce Commission.

[5] Certain of the cases are frankly wartime decisions, and will not serve for precedents in times of peace.

United States v. Mulligan, D.C., 1920, 268 F. 893, may have been first to use the phrase "Quasi Public Record." This case is a good example of how decisions under wartime statutes make precedents that are apt to be followed uncritically in times of peace.

the petition for a compliance order is denied.[6]

(The notes have been added since the opinion was rendered)

### Appendix

Following are the affidavits on which the motion was heard:

"For the Administrator:

"I, Julian C. Ingram, being first duly sworn, depose and say that during the times herein mentioned, I have been and now am an investigator for the Lumber Enforcement Unit, and employed by the Office of Price Administration at the Portland District Office in the Bedell Building, Portland, Oregon:

"That on the 18th day of January 1945 I called on the Trio Lumber Co., at 257 East Tenth Street, Eugene, Oregon, for the purpose of serving a subpoena on the owner, R. U. Bronson, but found that he was out of town.

"That I again called on the Trio Lumber Co. the next day, the 19th of January 1945, at 8:56 A.M. and served the subpoena personally on the owner, R. U. Bronson, at his above mentioned office, for the purpose of examining the records of the Trio Lumber Co.

"That Mr. Bronson read the supoena over and made no comment but called up his attorney, Mr. E. O. Immel in the First National Bank Building, Eugene. Mr. Bronson then stated that Mr. Immel would see us at his office at 9:30 A.M.

"That Mr. Bronson and I arrived at Mr. Immel's office at 9:35 A.M., that Mr. Immel read over the subpoena and discussed it with Mr. Bronson and then said to me 'We are going to have to refuse this request.'

"Mr. Bronson and I left Mr. Immel's office at 10:05 A.M."

For the defendant: [7]

---

[6] One gets the impression from the protest of Arnold, A. J., dissenting in Rainbow Dyeing & Cleaning Co. v. Bowles, 1945, — App.D.C. —, 150 F. 2d 273, that the friends of the older agencies have become disturbed by claims that have lately been made in the name of administrative power. See Judge Taylor rejecting the contention that the Administrator's determination as to materiality of documents is final and binding on the courts. Bowles v. Cherokee Textile Mills et al., D.C., 1945, 61 F. Supp. 584, 585, 2nd col.:

" * * * I cannot assume, as said in the American Tobacco Company case (Federal Trade Commission v. American Tobacco Co.), 264 U.S. 298, at page 305, 44 S.Ct. 336, 337, 68 L.Ed. 696, 32 A. L.R. 786, 'that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire * * *.' "

Undismayed by Cudahy Packing Co. of Louisiana v. Holland, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895, OPA Administrator Chester Bowles on May 28, 1944, issued a press release that the Office of Price Administration proposed to delegate the subpoena power throughout the country. I am informed that delegation was not attempted, for what reason I do not know.

That the quality of the work of administrative agencies varies, in the eyes of the Supreme Court, see Guiseppi v. Walling, 2 Cir., 1944, 144 F.2d 608, 619, 155 A.L.R. 761; 58 Harv.L.Rev. 1018, 1066–1067, September 1945.

United States v. Davis, 2 Cir., 151 F. 2d 140, just published, bears on the questions discussed in this opinion.

[7] The view held in some quarters that the courts must rubber-stamp administrative subpoenas in all cases where records are required to be kept, has not been (directly) urged on the Supreme Court. In this connection, see the remarks from the Supreme Court bench at the argument in Hecht Co. v. Bowles, 1944, 321 U.S. 321, 64 S.Ct. 587, 88 L. Ed. 754, reported in The United States Law Week for February 8, 1944 (12 LW Sec. 3, 3257):

Mr. Chief Justice Stone then observed that these orders of administrative agencies depend upon courts of equity for enforcement—thus indicating that even in the cited instances the courts were not totally shorn of their equity powers.

" * * * are we to allow the issuance of an injunction in a case where the court would not punish for contempt?" asked the Chief Justice. "Can we assume that the Congress intended that a court should issue a mere paper injunction?"

"Petitioner has argued that the Administrator's construction of the Act would make a rubber stamp of the courts," Mr. Lane for the Government declared.

Mr. Lane then argued that the Court should not be frightened by the protestations of Mr. Horsky (counsel for The Hecht Company) anent the destruction of the courts' equity powers.

"It seems to me that by the same reasoning we should not be frightened

"I, R. U. Bronson, being first duly sworn, depose and say:

"That I am the respondent in a proceeding by the Office of Price Administration for an order requiring compliance with an administrative subpoena which was served upon me on January 19, 1945 and which demands the following documents: Car book, lumber tally cards, purchase orders to the mill, invoices from the mill, invoices to the customers, customers orders and/or acknowledgments to customers relating to the purchase and sale of lumber from November 1, 1942 to date.

"That I am in the wholesale lumber business operating under the name of Trio Lumber Company, which is not a corporation.

"That during the months of May, November and December, 1943, representatives of the Office of Price Administration called at my office and requested permission to examine the books and records of said business; that such permission was freely and voluntarily granted and that said representatives during said months spent approximately 48 man days in the examination and copying of said records, including records demanded by the subpoena herein.

"That on May 20, 1944 a civil action was filed by the Administrator of the Office of Price Administration against me seeking treble damages for alleged sales of lumber in excess of maximum ceiling prices in the total amount of $60,000.00. Said complaint was in blanket form and did not itemize the invoices involved or the sales alleged to have been made in excess of maximum ceiling prices. This suit, designated as Civil Case No. 2438, is still pending in the United States District Court for the District of Oregon.

"On June 12, 1944, attorneys for the Office of Price Administration filed a motion to produce various records under Rule 34 of the Federal Rules of Civil Procedure. Said motion was denied.

"On January 19, 1945, I was served with an administrative subpoena calling for the records and documents set forth above. On advice of counsel I declined to produce the documents demanded.

"On January 24, 1945, attorneys for the Office of Price Administration filed a motion to enforce said subpoena entitled in Civil Action No. 2438. It is my information and belief that this motion and subpoena were filed for the purpose of securing information needed by the Office of Price Administration for the purpose of preparing for the trial of said case. Thereafter a motion was filed by my attorneys to quash

---

by the Administrator," Mr. Justice Jackson said.

"You used the term a moment ago," observed Mr. Justice Jackson, "that if it came up on contempt the court would have to vindicate its own process. It seems to me you get into some serious difficulties which you haven't touched in your brief. Is the court obliged to vindicate its own process when it is required to issue a process knowing that it is going to be violated? How far can Congress go in its mandates to the courts—do we have to issue a flock of injunctions which we know are meaningless and ineffective? * * *"

"We shouldn't issue injunctions to be trifled with," Mr. Justice Jackson added. "An injunction should be respected. I would like to stop inflation, but I would also like to have the judiciary system left for the country when the war is over."

Note the line of cleavage indicated in Cudahy Packing Co. v. Holland, 315 U. S. 357, 788, 62 S.Ct. 651, 86 L.Ed. 895. The Chief Justice: " * * * a power of inspection at the employer's place of business to be exercised only on his consent." 315 U.S. at page 364, 62 S.Ct. at page 655, 86 L.Ed. 895. Mr. Justice Douglas: "But now we are told that that power when delegated is only a power to be exercised with the employer's consent." 315 U.S. at page 370, 62 S. Ct. at page 658, 86 L.Ed. 895.

This was said in the late case of Oklahoma Press Pub. Co. v. Walling, 10 Cir., 147 F.2d 658, 660 [1] (1945) dealing with the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq.:

" * * * [the language of the Act] clearly envisages a judicial act, and in the classical words of Judge Johnsen of the Eighth Circuit [137 F.2d 501], 'judicial enforcement necessarily is the exercise of judicial power, and judicial function can never wholly escape the test of judicial responsibility.' "

And this explanation of the Public Record cases has just been uttered: "They (referring to records kept pursuant to the Price Control Act) are open to inspection by such persons and officers as are duly authorized under the statute to inspect them, and do not come within the immunity provisions of the statute or constitution." Bowles v. Seitz, D. C., Oct. 10, 1945, 62 F.Supp. 773, 775[4]. See also Bowles v. Shawano Nat. Bank, 7 Cir., Nov. 13, 1945, 151 F.2d 749.

said subpoena. Both the motion by the Office of Price Administration and the motion to quash said subpoena are now pending before Judge Fee, District Judge of the District Court of the United States, for the District of Oregon.

"On March 3, 1945, a second motion was filed by attorneys for the Office of Price Administration to enforce the same subpoena based on the same affidavit and in language almost identical with the previous motion, except for the fact that the second motion was not entitled in Case No. 2438, but assumed to bear the title of a separate proceeding. I am informed and believe that this second motion has the same purpose as the previous motion filed by the Office of Price Administration, namely, to secure evidence needed by the Government in order to prepare for the trial of Civil No. 2438.

"I have made a preliminary examination and search for the records and documents demanded and have discovered that in order to comply with this subpoena it would be necessary to examine and remove the demanded documents from over 4000 files on separate sales since November 1, 1942.

"I do not have in my possession lumber tally cards as requested by the government for the reason that in the regular course of business such tallies were not forwarded by the mills to me, and, except in isolated instances, are not in my possession and control, either individually or as manager of the Trio Lumber Company. In order to produce lumber tally cards furnished in some isolated instances, it would be necessary to search the files for approximately 4,000 sales during the period in question, unless the government designates specifically the lumber tally cards desired.

"Complete and accurate information including description of the lumber involved in all sales, the name and address of the other party to the transaction, the date of the sale, and the price thereof, as required by Revised Maximum Price Regulation No. 26, and by M.P.R. 402, 284 and 556, is recorded upon and shown by the invoices furnished to customers by the Trio Lumber Company, copies of which are contained in my files. None of the other records or documents demanded by the government's subpoena were or are required to be kept by said regulations.

"At all times I have endeavored to act in good faith with all the requirements of the Emergency [Price] Control Act [50 U.S.

C.A.Appendix, § 901 et seq.] and regulations issued thereunder and deny that I have ever violated said Act or regulations. I also deny that the documents demanded by the government are relevant to any legitimate inquiry. I am prepared to submit testimony upon these matters should the opportunity be presented in this proceeding."