**DANEBO LUMBER CO., Inc. et al. v. KOUT-SKY–BRENNAN–VANA CO.**

**KOUTSKY–BRENNAN–VANA CO. v. DANEBO LUMBER CO., Inc., et al.**

No. 12163.

United States Court of Appeals
Ninth Circuit.

May 17, 1950.

Maurice W. Seitz and C. D. Christensen, Portland, Or., for appellants Danebo Lumber Co. and others.

George C. Reinmiller, Portland, Or., Winters & Winters, Omaha, Neb., for appellant Koutsky-Brennan-Vana Co.

Before DENMAN, Chief Judge, McALLISTER, Circuit Judge,* and McCORMICK, District Judge.

DENMAN, Chief Judge.

This appeal was consolidated for argument with the appeals in Furrow v. Koutsky-Brennan-Vana Company, 9 Cir., 182 F.2d 496, in which the decision is this day filed. The opinions in the two cases supplement each other.

* Sixth Circuit, sitting by special designation.

Danebo Lumber Company, Inc., hereafter called Danebo, a lumber wholesaler, and Mark C. Storms appeal from a judgment in a suit in equity for rescission and accounting awarding against them to the Koutsky-Brennan-Vana, Company, hereinafter called Vana, a lumber retailer, the sum of $15,000, being moneys paid Danebo under a contract of which the court granted rescission. The contract was alleged in the complaint and found by the court[1] to have been made in a conspiracy to violate the Emergency Price Control Act of 1942, as amended,[2] hereinafter called the Act.

Danebo contends that the conspiracy alleged by Vana's complaint and found by the court was known by Vana to be *malum in se;* that Vana is *in pari delicto* with Danebo; and that the district court erred in exercising its equity powers in rescinding the contract and in requiring an accounting of the moneys paid by Vana as its pretended consideration for the pretended promises of Danebo.

■ Since the complaint shows any right to rescind and to secure an accounting for the $15,000 arises from the violation of a federal statute, the district court had jurisdiction under 28 U.S.C.A. § 1331. There was also diversity of citizenship of the parties.

The judgment allowed interest from the date of the filing of the findings of fact and conclusions of law and costs to appellee.

The judgment creditor Vana cross appeals seeking to increase the interest awarded by its allowance from the date the lumber was agreed to be shipped.

The conspiracy shown by the evidence was to secure the agreement of Danebo to sell its lumber to one Kincaide, a wholesaler at over ceiling prices. Kincaide had been selling lumber as a wholesaler to Vana and a number of other retailers in the Middle West, receiving from them his 5% commission allowed by the price regulations. He advised Vana and the other retailers that he had no lumber to sell them but he would be able to buy lumber from Danebo if they would pay to Danebo $10 per 1000 board feet for the lumber Danebo would sell to Kincaide at the ceiling price. If Vana thus persuaded Danebo so to sell the lumber to Kincaide he would be able to sell to Vana and the others at the ceiling prices, plus the allowed 5% commission.

The arrangement for Vana and the others to pay the excess over the ceiling was through Storms, the president of Danebo. The method of payment was a sham contract with Storms whereby Vana was to pay for an option to buy from Storms stock which Storms held in Danebo, Storms to turn over the moneys so received to Danebo in payment at the rate of $10 per 1000 feet for the lumber to be sold to Kincaide. Vana's check for $15,000 payable to Storms was given him, for which Vana received an option contract

1. "Findings of Fact
"Supplementing the brief statement which I made at the end of the trial, I find that plaintiff and defendants and others were engaged in a conspiracy to violate the Emergency Price Control Act of 1942, as amended, and the regulations thereunder, and that the sum sued for herein was paid by plaintiff through the medium of defendant Kincaide, to defendant Storms, and by the latter to the Danebo Lumber Company, in furtherance of and as one of the overt acts.
"Conclusions of Law
"Plaintiff is entitled to judgment as prayed for, except as to defendant Kincaide."
The statement referred to is:
"The Court: My holding will be this—I will amplify these findings at an appropriate time.

"This was a conspiracy which all the parties engaged in, the buyers and the sellers, to violate and evade the Price Control Act and appropriate regulations thereunder; and I feel, under the circumstances of this case, that the plaintiff is entitled to recover against the Lumber Company, defendant, and as against Storms, defendant. As to that, I will file a written memorandum later but, generally speaking, it is on the theory of money had and received and unjust enrichment, both of Storms and the Lumber Company, so I hold them as defendants and, by the converse, I do not hold the defendant Kincaide."

2. 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq.

from Storms, dated August 29, 1946, purporting to agree to sell 490 shares of the stock at $250 per share. Storms endorsed the check to Danebo and Danebo made its agreement to sell the lumber to Kincaide.

Vana thus paid in advance the entire over ceiling part of the sales price of a million and a half feet of lumber which Danebo was to sell to Kincaide at the ceiling price. That contract with Danebo was fully executed by Vana. Danebo executed its contract with Vana so far as concerns Danebo's making of the agreement to sell the lumber to Kincaide. Kincaide testified that Danebo never refused to sell him lumber "under that contract." They could not agree on the post ceiling market price and it was not proved that the disagreement was the fault of Danebo.

The moneys from the options to Vana and other retailers was used by Danebo in the construction of its mill, which was not completed for the manufacture and delivery of the lumber until the following April 1, 1947. The price controls on lumber had been taken off the previous November. When the price controls were taken off Vana made no claim for the return of its $15,000. Instead of repentance, it demanded from Kincaide the delivery of lumber at a price of $10 per thousand under the prices charged by Weyerhauser and Long-Bell, the largest wholesalers in the lumber industry, claiming that this was the agreement it made with Kincaide. This latter agreement was not proved at the trial. Kincaide said Danebo declined to sell to him with any such deductions from the then open market price. Danebo at no time disavowed the agreement with Vana and its president, Storms, testified that they were at all times ready to sell the stock at the agreed price.

It was not until the following August 28, 1947, about a year after the execution of the agreement, that Vana, for the first time, approached Danebo and sought to rescind the contract and obtain the return of the $15,000.

■ A. *The sham contract with Danebo for the purpose of avoiding the Price Control Act and its regulations and deceiving its officers, fully executed by Vana by the payment of a consideration of $15,000 and by Danebo by the making of its contract to sell to Kincaide, then being a felonious blackmarket conspiracy both to violate a federal criminal law and to defraud the United States, is a transaction malum in se in which Vana is in pari delicto with Danebo.*

Vana's significant testimony regarding its *mala fides* is that Kincaide told it, respecting the option contract with Danebo, "Now, of course, you know, like in the Eclipse Deal, there will be a purported option set up and you will get one of these for your files, *in the event anything comes up and the Government checks up to find out if there is any violation, and you can show them that you have got this purported option * * *.*" (Emphasis supplied.)

Here is a felonious conspiracy to defraud the United States under the then section 37 of the Criminal Code, 18 U.S.C.A. § 88 [now § 371], now surviving by virtue of the saving clause of § 21 of the Act of June 25, 1948, c. 645, 62 Stat. 862. The blackmarketing of lumber is sought to be concealed by deceiving the O.P.A. officers in the performance of their duties created by this war-time legislation. On this conspiracy the statute of limitations apparently has not yet expired, its running being tolled for three years by the Act of August 24, 1942, 56 Stat. 747, 18 U.S.C.A. § 590a, [now § 3287] as amended.

It is further a conspiracy to commit the crime of violating section 4(a) of the Price Control Act prohibiting agreements or solicitations to sell at prices in excess of the O.P.A. maximum, for which the maximum penalty under section 205(b) of the Act is a fine of $5,000 and a year's imprisonment. See Sec. 1(b) of the Act.

Vana's payment of $15,000 as consideration for Danebo's agreement to commit this crime is like that of the payment for homestead lands to be procured by perjured affidavits of which the Supreme Court, in denying relief for non-performance of the conveyance of the land, held the payor to be in *pari delicto* with the other party to the contract, saying:

"The fact that Anderson has received full payment for the land only makes stronger the fact that perjury on his part was essential to his obtaining the title, for clearly it was not then to be obtained for him but for Carkins, and does not in the least militate against the public policy disclosed in the federal statutes, that the acquisition of title must be for the exclusive benefit of the homesteader. * * *

"The supreme court of Nebraska, recognizing the general rule as to the invalidity of contracts against public policy, seemed to think that the parties were not *in pari delicto;* but we are unable to see any distinction in moral status between the man who contracts for the perjury of another and the one who contracts to commit such perjury. The fact that the former party may have parted with money or valuable property does not change the quality of his action, or give him higher claim to the consideration of a court of equity. So it results that the federal question in this case was not rightly decided by the state court, and no other question appears, which, rightly decided, upholds its decree. The case therefore must be reversed * * *." Anderson v. Carkins, 135 U.S. 483, 491, 10 S.Ct. 905, 907, 34 L.Ed. 272.

It is obvious that those engaged in such felonies are most likely to commit the further crimes of passing on to their customers the illicit cost of the lumber. This is done either by retailing it at prices in excess of the maximum or by deceitfully upgrading it, such as by selling as clear lumber the upper grades of common, or by selling the upper grades of common and delivering the lower. Each such sale of a lower grade of lumber at the price of the higher would be another crime in violation of the Act.

In addition to such likely wrong to the ultimate consumers of lumber is the certain injustice to the vast majority of honest and law abiding lumber retailers, had the further crimes of above ceiling sales been committed. The war drafting of loggers and diminished log supply and the drain on the stocks by the war construction created a shortage of lumber to meet the huge demand for housing pent up during the war years. Every thousand feet of lumber which would have been taken out of the wholesale market by such crooked devices as those of appellee, to that extent would have further decreased the supply to honest retail merchants.

The legislation was enacted when we were at war. Congress knew from the first world war the painful and disrupting dislocations in our national economy and in that of our citizens that would necessarily arise during the war and in the succeeding war-caused shortages of lumber and other material. Exorbitant prices to those of fixed incomes, such as the bank clerk seeking to build a home for his family, are expressly stated by Congress as one of the evils the legislation seeks to avoid. It is not irrational to expect that the present cold war may ripen into another world war of greater intensity and with greater need for the enforcement of price regulations against such conspiracies as here pleaded and proved.

B. *Equity will not lend its power to Vana, a party to a contract in which it had paid the full consideration to Danebo and known by it to be malum in se, because executed in a criminal conspiracy to violate a federal law to prevent excessive prices caused by war shortage [3] and to prevent a post war emergency collapse of value,[3] to rescind the contract and restore*

3. The Emergency Price Control Act of 1942, states its purposes in Section 1(a), as follows: "(a) It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents; to eliminate and prevent profiteering, hoarding, manipulation, speculation, and other disruptive practices resulting from abnormal market conditions or scarcities caused by or contributing to the national emergency; to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standard of

*to Vana's unclean hands the moneys given to Danebo as consideration for its joining in the contract's execution.*

■ The law is stated in an opinion of Mr. Justice Stone in Second Russian Ins. Co. v. Miller, 268 U.S. 552, 562, 45 S.Ct. 593, 597, 69 L.Ed. 1088, to be "By our own law payments made under contracts which are illegal where the parties are *in pari delicto* may not ordinarily be recovered. The law leaves the parties where it finds them and gives no relief. Thomas v. City of Richmond, 12 Wall. 349, 20 L.Ed. 453; * * * St. Louis V. & T. H. R.R. v. Terre Haute R.R. Co., 145 U.S. 393, 407, 12 S.Ct. 953, 36 L.Ed. 748; Harriman v. Northern Securities Co., 197 U.S. 244, 294, 25 S.Ct. 493, 49 L.Ed. 739; * * * Levy v. Kansas City, 8 Cir., 168 F. 524 * * * 22 L.R.A.,N.S., 862. * * *"

In St. Louis V. & T. H. R.R. v. Terre Haute R.R., 145 U.S. 393, 12 S.Ct. 953, the St. Louis Railroad sought to cancel and set aside a conveyance of the plaintiff's railroad and franchises to the defendant for a term of nine hundred and ninety-nine years, the defendants agreeing to pay the plaintiff a portion of the profits from the operation of the railroad. The contract was illegal, being in excess of the corporate powers of the defendant railroad. With all but seventeen years of this contract still executory on the part of the defendant but fully performed by the plaintiff in the transfer of its railroad and franchises, the Supreme Court held that a court of equity would not exercise its powers of rescission and accounting, saying, 145 U.S. at pages 407 and 408, 12 S.Ct. at page 957,

"When the parties are *in pari delicto,* and the contract has been fully executed on the part of the plaintiff, by the conveyance of property, or by the payment of money, and has not been repudiated by the defendant, it is now equally well settled that neither a court of law nor a court of equity will assist the plaintiff to recover back the property conveyed or money paid under the contract. Thomas v. Richmond, above cited; Ayerst v. Jenkins, L.R. 16 Eq. 275, 284.

"For instance, property conveyed pursuant to a contract made in consideration of the compounding of a crime, and the stifling of a criminal prosecution, and therefore clearly illegal, cannot be recovered back at law, nor the conveyance set aside in equity, unless obtained by such fraud or oppression on the part of the grantee that the conveyance cannot be considered the voluntary act of the grantor. Inhabitants of Worcester v. Eaton, 11 Mass. 368, and 13 Mass. 371 [7 Am.Dec. 155]; Atwood v. Fisk, 101 Mass. 363 [100 Am.Dec. 124]; Bryant v. Peck & Whipple Co., 154 Mass. 460, 28 N.E. 678; Williams v. Bayley, L.R. 1 H.L. 200; Jones v. Merionethshire Society, 1892, 1 Ch. 173, 182, 185, 187."

What is held in the St. Louis Railroad case applies *a fortiori* to the contention of Vana. Vana's contract was not only illegal, it was felonious. Its claim that it was coerced by Danebo because otherwise it could not obtain the lumber is as absurd as it would be for an embezzler to claim he is not guilty when he took his employer's money because otherwise he could not have paid off a mortgage on his home.

What was held in the St. Louis Railroad case is quoted in Harriman v. Northern Securities Co., 197 U.S. 244, 295, 25 S.Ct. 493, 504, 49 L.Ed. 739, in denying the rescission of a contract held illegal, the Supreme Court again asserting the rule, saying, "And this in defiance of the settled rule that property delivered under an illegal contract cannot be recovered back by any party *in pari delicto.*"

In Higgins v. McCrea, 116 U.S. 671, 685, 6 S.Ct. 557, 564, 29 L.Ed. 764, the Court refused rescission of an invalid wagering contract, quoting the statement of Lord

living; to prevent hardships to persons engaged in business, to schools, universities, and other institutions, and to the Federal, State, and local governments, which would result from abnormal increases in prices; to assist in securing adequate production of commodities and facilities; to prevent a post emergency collapse of values; * * *."

Mansfield in Holman v. Johnson, Cowper, 341, 343.

"\* \* \* 'the objection that a contract is immoral or illegal, as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. *It is not for his sake, that the objection is ever allowed, but it is founded on general principles of policy, which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff,* by accident, if I may so say. The principle of public policy is this: *ex dolo malo non oritur actio.* No court will lend its aid to a man who founds his cause of action upon an immoral or illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appear to arise *ex turpi causa,* or the transgression of a positive law of the country, there the court says he has no right to be assisted. It is upon that ground the court goes, not for the sake of the defendant, but because they will not lend their aid to such a plaintiff. So, if the defendant and the plaintiff were to change sides, and the defendant were to bring his action against the plaintiff, the latter would then have the advantage of it, for when both are *equally*[4] in fault *potior est conditio defendentis.'*

"If, therefore, the defendant intended to embark his money in an illegal and criminal venture, we do not see how his case is helped by the fact that the purpose of the plaintiffs was to invest the money so advanced in what they understood to be a lawful and innocent transaction." (Emphasis supplied.)

Here, though it comes ill from the mouth of Danebo that it relies upon the illegal character of this contract, it is not for Danebo's sake but to prevent such felonious subversion of legislation to avoid the evil effects of the war and subsequent war-caused emergency on the part of those who otherwise would be encouraged to engage in similar felonies.

In Thomas v. City of Richmond, 12 Wall. 349, 20 L.Ed. 453, Thomas brought his suit to recover on notes issued by the city. As in the instant case, it was criminal both for the city authorities to issue them and on the part of the party who paid for them. Of this the Court said in 12 Wall. at page 356, "\* \* \* The issuing of bills as a currency by such a corporation without authority is not only contrary to positive law, but, being *ultra vires,* is an abuse of the public franchises which have been conferred upon it; and the receiver of the bills, being chargeable with notice of the wrong, is *in pari delicto* with the officers, and should have no remedy, *even for money had and received, against the corporation upon which he has aided in inflicting the wrong* \* \* \*." (Emphasis supplied.)

The last of the cases so cited in Second Russian Ins. Co. v. Miller, supra, as establishing the law is Levy v. Kansas City, 8 Cir., 168 F. 524. In principle it is identical with the instant appeal. There the City of Kansas had issued a license to Miller as a race track bookmaker, licensing him for a year to make such racing bets in that city. He paid the city $5,000 for the license. When but two days of the year's agreement had elapsed the city caused Miller's arrest on the ground that he was violating a Kansas state law making it a crime so to make books—that is to say, the agreement was practically completely executory. The city refused Miller's demand for the return of his $5,000 and he sued alleging these facts. The district court sustained a demurrer and entered judgment against Miller.

Judge Sanborn's opinion in affirming the judgment stated, 168 F. at page 525, " 'Ex dolo malo non oritur actio' is a maxim which lies at the foundation of a general rule of public policy, the rule that the courts will not sustain an action which arises out of the moral turpitude of the plaintiff or out of his violation of a general law enacted to carry into effect the public policy of the state or nation. \* \* \*"

Similarly in Marshall v. Lovell, 19 F.2d 751, 755, the Eighth Circuit Court of Appeals held that "The fact that the action is one to recover back money paid under an illegal contract and not an action to en-

---

4. Emphasis not ours.

force the contract makes no difference." Also in Farrington v. Stuckey, 8 Cir., 165 F. 325, where the wrongful agreement was not at any time to build a station between two others, the circuit court of appeals refused to rescind and restore a bonus paid for the agreement, although the illegal agreement was still executory.

The federal cases relied upon by Vana are clearly distinguishable. In Spring Co. v. Knowlton, 103 U.S. 49, 26 L.Ed. 347, the transaction, instead of being felonious as to both parties, was expressly held not malum in se. Neither party realized that its action violated any law and the scheme was abandoned when its illegal character was realized. In Block v. Darling, 140 U.S. 234, 11 S.Ct. 832, 834, 35 L.Ed. 476, Darling sued to recover money paid to defendants. They contended that Darling, an insolvent, gave them the money to cheat and defraud creditors. It was held that Darling could recover because his suit "if successful, would tend to defeat the alleged purpose of defrauding his creditors by having it kept upon secret deposit with the defendants. * * * To allow the defendants to retain it upon the ground that he had originally the purpose to conceal it from his creditors would be inconsistent with the spirit and policy of the law."

In Parkersburg v. Brown, 106 U.S. 487, 503, 1 S.Ct. 442, 455, 27 L.Ed. 238, the recovery was allowed because the court stated, " * * * There was no illegality in the mere putting of the property by the O'Briens in the hands of the city. To deny a remedy to reclaim it is to give effect to the illegal contract. The illegality of that contract does not arise from any moral turpitude. The property was transferred under a contract which was merely *malum prohibitum*, and where the city was the principal offender. In such a case the party receiving may be made to refund to the person from whom it has received property for the unauthorized purpose, the value of that which it has actually received. * * *"

In Pullman's Palace Car Co. v. Transportation Co., 171 U.S. 138, 18 S.Ct. 808, 813, 43 L.Ed. 108, the Central Transportation Co. illegally leased to the Pullman Co. all its plant, sleeping cars and other personal property for 99 years, and also agreed that it would not engage in the business of manufacturing, using or hiring sleeping cars while the contract remained in force. The Pullman Co. rental was $264,000 per annum. The Court found the Transportation Co.'s lease *ultra vires* and void, but further found that it involved the "abandonment by that company of its duty to the public" and in order to restore it to a position in which it could perform its public duty, accepted the abandonment and allowed a recovery of the value of the property whose transfer had prevented the performance of that duty. The decision contemplates, 171 U.S. at page 155, 18 S.Ct. at page 815, "the probability or possibility of renewals of the contracts owned by the company for the use of its cars upon the railroads of the companies with which it had such contracts, and the possibility of extending its business in the future under contracts with other railroads." The Court stated that "the company may not have incurred any moral guilt."

Clearly, this Pullman Co. case affords no analogy to moral guilt of the felonious conspiracy of Danebo and Vana. The return of the money to Vana, who owed no public obligation in its use, would serve no public purpose.

The judgment is reversed and the complaint ordered dismissed.

McCORMICK, District Judge, concurs in the result.