FURROW v. KOUTSKY–BRENNAN–VANA CO. et al.

KOUTSKY–BRENNAN–VANA CO. et al. v. FURROW.

DAY & FREES et al. v. FURROW.

No. 12254.

United States Court of Appeals Ninth Circuit.

May 17, 1950.

Maurice W. Seitz, Portland, Or., A. R. Hilen and Gerald DeGarmo, Seattle, Wash., for appellant Furrow.

George C. Reinmiller, Portland, Or., S. L. Winters, Omaha, Neb., for appellants Koutsky-Brennan-Vana Co.

Graham, Green, Howe & Dunn, Bryant R. Dunn and Frank T. Rosenquist, Seattle,

Wash., for appellants Mawson and Colorado Nat. Bank.

Before DENMAN, Chief Judge, McALLISTER, Circuit Judge,* and McCORMICK, District Judge.

DENMAN, Chief Judge.

These appeals were consolidated for hearing with that in Danebo Lumber Company, Inc. v. Koutsky-Brennan-Vana Company, 9 Cir., 182 F.2d 489, hereafter called the Danebo case, the opinion in which is this day filed. The opinions in the two cases supplement each other.

Furrow appeals from a series of judgments in favor of appellees, retailers of lumber in the States of Iowa, Nebraska and Colorado, hereafter called the retailers, in a suit begun by the complaint of Koutsky-Brennan-Vana Company, a corporation, hereafter called Vana, in which suit there were filed by the other appellees complaints in intervention. Each retailer's complaint states a cause of action substantially identical in the federal law involved with that in Vana's complaint in the Danebo case,— that is, each complaint seeks rescission of a contract made in a felonious blackmarketing conspiracy to defraud the United States and to violate the maximum price regulations of the Emergency Price Control Act[1] and for the restoration of moneys given appellant to persuade him to enter into a conspiracy identical with that in the Danebo appeal.

■ Frank O. Akin and Richardson Lumber Company, also retailers, appeal from the dismissal of their complaints in intervention after the taking of evidence, hereafter considered, had been concluded, because, though suing for over $3,000, the parties lack diversity of citizenship. As held in the Danebo case, their cases present a question of federal law. The judgment dismissing these appellants is reversed, the intervention is granted, and their appeals are before us for consideration of their merits.

Pauley Lumber Company, Day & Frees, and Harberg Lumber Company appeal from the denial of intervention of similar complaints on the ground that each of the amounts sought to be recovered was for less than $3,000. The judgment denying them intervention is affirmed.

The blackmarketing activities of Kincaide, the same wholesaler of the Danebo opinion, are here fully disclosed. To develop his wholesaling business he became the go-between in transactions between willing blackmarketing retailers in cities in Iowa, Colorado and Nebraska and similarly willing lumber manufacturers, and those controlling the output of lumber mills. In these transactions the retailers paid the lumber manufacturers or those controlling them the overceiling part of the price in consideration of their procuring for Kincaide the delivery of lumber to him from the manufacturers at the ceiling maxima, which he would resell to the retailers at ceiling prices. By this device Kincaide procured an apparently innocuous agreement to buy lumber at the ceiling price, which on resale he was paid his legitimate commission of 5%.

In dealings prior to those with Furrow, he had arranged for these retailers similar felonious agreements. The retailers in this case needed more lumber in the short lumber supply created by the pent-up demand for lumber during the war years, described in our opinion in the Danebo case. Kincaide approached Furrow, telling him that he had such retailer customers in the Middle West, and proposed to him that for the payment to Furrow by the retailers of the over ceiling price, Furrow would procure from the Douglas Fir Products Company, Inc., controlled by Furrow, a contract to sell lumber to Kincaide at ceiling prices. The lumber sold to Kincaide he, in turn, would resell to the retailers.

Unlike Storms in the Danebo case, where Storms claimed throughout that his options were legitimate transactions which Storms was willing to perform, Furrow baldly offered in his testimony that in a conversation with Kincaide,

* Sixth Circuit, sitting by special designation.

1. 56 Stat. 23, 50 U.S.C.A.Appendix, § 901 et seq.

"I said I couldn't afford to sell it at ceiling prices because I could ship it back to my yards and they could realize a profit on it, and *he said* he thought perhaps something could be arranged that I could get more than ceiling prices out of it, that he had a bunch of boys that he bought for around Iowa and Nebraska [in the past at overceiling prices]. They needed lumber badly and perhaps he could make some arrangement, and I said nothing more at that time and so we just dropped the matter.

"But he saw me again and wanted to know if I had thought that over, and I said, 'Well, what kind of arrangements could you make?' 'Well,' he said, 'how would you like to sell your interest in the mill or give an option on it,' and that he could realize—he could fix it so that if we could sell an option so that the option money would be $10 more on dimension and $12 more on boards, and I told him I might be interested.

"And then he came again and said that he had a bunch of fellows out there who were very anxious to get some lumber and wanted to work out some kind of a deal, and I told him how many shares I had, and he worked it out himself into what he called units, and that if I would give an option on 40 shares of stock, that they would buy an option and at $10 a thousand on 300,000—oh yes, his units' were 500,000 feet, and that 300,000 feet at $10 made $3000, and 200,000 feet made $2400, which would make $5400 a unit, and I told him that I might be interested * * * *."

The blackmarketing arrangement was consummated. The retailers paid the money to Furrow for the options to buy the stock at the rates indicated to procure the lumber by purchase from Kincaide in one or more of the units referred to. Furrow's testimony is that Furrow caused the Douglas Fir Products Company to give Kincaide its contract to purchase its lumber at ceiling prices. There was no proof that appellants attempted to rescind until it became apparent to them that the contract was no longer advantageous to them.

Unlike in the Danebo case, where the short finding, without more, is that the transaction was a conspiracy to violate the O.P.A. law, the district court in the instant case found all of the above facts constituting the felony of a fraud against the United States, except the executed portion of the felonious agreement of the making of the contract for the sale of the lumber to Kincaide. That, however, appears in the evidence, which included the text of that contract.

As in the Danebo case, none of the retailers secured any lumber from Kincaide before the ceiling price was removed. All but the Vana Company and the Richardson Company received some lumber after the ceilings were removed at the prevailing market rate. The district court gave judgment to Vana for the full sum it paid Furrow. As to those receiving lumber, they had judgment for the amounts paid less $10.80 per thousand of the lumber delivered to them.

The process of reasoning of the appellees is plainly that such blackmarketing was universal among the several thousands of manufacturers and wholesalers throughout the United States, who were supplying these retailers in the Middle West. This appears in the testimony of Kincaide and others in describing their own felonious conduct. We take judicial notice of the fact that such a contention does not accord with the facts. Even if it were true that "everybody is doing it," nobody so could violate the law with clean hands.

Nor can it be said that the retailers are not in pari delicto with Furrow, though paying him the moneys to persuade him to sell to them at overceiling prices. To this, as in the Danebo case, is applicable the holding of the Supreme Court in Anderson v. Carkins, 135 U.S. 483, at page 491, 10 S.Ct. 905, 34 L.Ed. 272, that one who contracts for another to perjure himself is in pari delicto with the one agreeing to commit perjury.

In Bowles v. Glick Bros. Lbr. Co., 9 Cir., 146 F.2d 566, we rejected the reasoning on which rests the claim that retailers are not in pari delicto with those supplying

the lumber because they could not otherwise satisfy their need for lumber in their retail business.

In the Glick case the lower court decided that the Administrator could not maintain a suit for the benefit of the government for treble damages under Section 205(e) of the Act providing for such suits where the retailer has bought lumber from the wholesaler at over ceiling prices. It held that the retailer has the sole right to recover such treble damages for himself. That court stated that a construction that the government may recover for itself from the wholesaler for his over ceiling sales to the retailer would be "unjust in thus permitting a squeeze to be made upon a retailer so as to put him out of business or induce him to break the law. If a retailer, in order to get commodities to serve his trade, is forced to pay excessive prices, but maintains the ceiling of the OPA in his sales to his consumers, he will ultimately go broke; if he refuses to pay excessive wholesale prices when they are demanded, he puts himself in the position of not being able to get merchandise for his customers, in which event he would also be forced out."

In disposing of that district court's contention of coercion, that is, being "forced out" of business by the wholesaler's "excessive" prices, we held that the retailer was in pari delicto with the wholesaler, stating, 146 F.2d at page 568: "The Section [205(e)] is to be read in conjunction with § 4(a). The latter makes it unlawful for any person to sell, or in the course of trade or business to buy a commodity for a price in violation of any regulation or price schedule, that is to say, *the buyer in the course of trade or business is deemed by the statute to be in pari delicto with the seller.* But one who buys for use or consumption other than in the course of trade or business—the ordinary non-commercial consumer—is not declared a violator. He is apparently thought to possess no choice in the matter. Hence he is the only member of the buying public empowered under § 205(e) to bring suit for treble damages. In all other cases the right vests in the Administrator for the use and benefit of the Nation as a whole." (Emphasis supplied.)

Nor can we agree with appellees' contention here that the retailer is not in pari delicto with Furrow because Furrow had his own yards in which Furrow could sell his lumber at a profit without committing any crime. Here is applicable what we have said in the Danebo opinion respecting wholesalers who feloniously take out of a limited supply to the market, lumber which otherwise honest retailers could buy.

With regard to Furrow, whom the law allows to keep the moneys paid him, the language of Judge Sanborn in his decision in Levy v. Kansas City, 8 Cir., 168 F. 524, discussed in the Danebo case, is clearly applicable. Judge Sanborn said, in 168 F.2d at page 526, "It is conceded that the action of the city in taking his money for a license to do business for a year under its ordinance, in depriving him of the use of this license two days later, and in refusing to return his money to him, *is abhorrent to the sense of fairness and justice and despicable.*" (Emphasis supplied.)

We think the conduct of Furrow in retaining the retailer's moneys is equally despicable, for which he well may find his penalty for such a violation of the code of honor among criminals in his future dealings with men of commercial honesty in the lumber trade and in establishing credit with his bankers.

As we said in the Danebo appeal, we have no certainty that the present cold war will not ripen into a third world war, when more than ever in our history we will need the strictest enforcement of laws to protect the average citizen from the evils Congress sought to alleviate in this legislation. In this connection, it should be noted that here the conspiracy was to defraud the United States under the then section 37 of the Criminal Code, 18 U.S.C.A. § 88 [now § 371], now surviving by the saving clause of § 21 of the Act of June 25, 1948, c. 645, 62 Stat. 862. The blackmarketing of lumber is sought to be concealed by deceiving the O.P.A. officers in the performance of their duties created by this war-time legislation. On this conspiracy

the statute of limitations apparently has not yet expired, its running being tolled for three years by the Act of August 24, 1942, 56 Stat. 747, 18 U.S.C.A. 590a [now § 3287], as amended.

The judgments in all the appeals except those of Pauley Lumber Co., Day & Frees and Harberg Lumber Company are reversed, and the complaints are ordered dismissed.

Judge McCORMICK concurs in the result.