CALIFORNIA PACIFIC BANK, a
California Banking Corporation,
Appellant,

v.

SMALL BUSINESS ADMINISTRATION,
an agency of the United States
government, Appellee.

No. 75–2246.

United States Court of Appeals,
Ninth Circuit.

July 13, 1977.

John P. Moffitt, argued, Jackson & Goodstein, Los Angeles, Cal., for appellant.

Matthew A. Schumacher, argued, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before HUFSTEDLER, GOODWIN and ANDERSON, Circuit Judges.

GOODWIN, Circuit Judge:

The California Pacific Bank (hereinafter "the Bank") appeals from summary judgment for the Small Business Administration (SBA) in a dispute arising out of loans to four small businesses made by the Bank and guaranteed by the SBA.

The SBA is empowered to make business loans either directly or through selected lending institutions. 15 U.S.C. § 636(a) (1970). The latter type of loan is made on either an "immediate" or "deferred" participation basis. Immediate participation loans are those in which the lending institution or the SBA agrees to purchase from the other, immediately upon disbursement, an agreed percentage of the loan. 13 C.F.R. § 122.7 (1977). The loans at issue here, however, were of the deferred variety, i. e., they were made by the Bank with a guarantee by the SBA to purchase an agreed percentage of them within a short time after default. 13 C.F.R. § 122.10 (1977).

The SBA guaranteed 90% of these four loans. This figure was not accidental. The Small Business Act expressly mandates that SBA "participation" in deferred loans "not be in excess of 90 per centum of the balance of the loan outstanding at the time of disbursement." 15 U.S.C. § 636(a)(3) (1970). Similarly, the SBA regulations provide that "[i]n guaranteed loans the exposure of SBA under guaranty may not exceed 90 percent of the unpaid principal balance and accrued interest." 13 C.F.R. § 120.2(b)(3) (1977). Congress intended this joint liability scheme to further the statutory purpose of encouraging banks to make loans to small businesses, while providing an incentive for the banks to make and manage these loans in accordance with their normal responsible fiscal policies. H.R.Rep.No.494, 83d Cong., 1st Sess., *reprinted in* [1953] U.S.Code Cong. & Admin.News pp. 2025, 2031.

Despite the clarity of this requirement, the Bank devised a scheme, called the "Loss Collateral Plan", which gave the Bank virtually 100% protection. After uncovering the scheme in an audit, the SBA threatened to withdraw its guarantee of the four loans unless the Bank rescinded the objectionable parts of the transactions and accepted a full 10% of the risk in the loans. The Bank

complied under protest. Subsequently, three of the four loans defaulted. The SBA paid its 90% share. Now the Bank is suing for the 10% it lost on the three loans, about $87,000, as well as for declaratory relief should the fourth loan also default.

The Bank claims that the SBA was apprised of the Loss Collateral Plan and approved it in each of the individual loan contracts. The Bank asserts that the plan was perfectly proper under the statute and the agency's regulations. Even if the contracts are found to be illegal, however, the Bank argues that the SBA's approval of the plan estops it from asserting the defense of illegality.

 Our examination, of course, is limited to determining the appropriateness of summary judgment. We seek only to determine whether there is in dispute a genuine issue of material fact. Fed.R.Civ.P. 56. The burden is on the government to demonstrate the absence of any such fact. *Weinberger v. Hynson, Westcott & Dunning,* 412 U.S. 609, 622 n. 18, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); 6 J. Moore, Federal Practice ¶ 56.15[1.–00] at 56–405 (2d ed. 1970). In viewing the facts we must draw all inferences in the light most favorable to the bank. *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Dibble,* 429 F.2d 598, 601 (9th Cir. 1970).

*The Negotiations and Contract*

In their affidavits, the bank officials claim to have been approached by one John Duran, representative of a finance company. It was Duran who originally proposed to the Bank that it make SBA guaranteed loans. The bank officials were reluctant to participate until Duran also proposed the Loss Collateral Plan. Under the plan, each of the businesses given an SBA guaranteed loan would be required to take out a second loan from the Bank. This loan would equal 10% of the first loan, an amount identical to the Bank's liability. As collateral to the

second loan, each business was required to purchase from the Bank a certificate of deposit[1] in the amount of twice the loan.

If the business defaulted on the loans, the Bank would demand the 90% guaranteed portion on the first loan from the SBA. The Bank would then take the money used to purchase the certificate of deposit and apply it to the remaining liability on both loans. With these additional funds in its coffers, the Bank was essentially 100% protected at all times.

Justifiably uncertain of the plan's legality, bank officials had Duran take to the Los Angeles SBA office for approval a letter outlining the Loss Collateral Plan. The letter, dated October 19, 1972, contained a hypothetical loan proposal to Early Education Investment, Inc., not one of the companies to which loans were subsequently made. This letter specifically noted that a second loan in the amount of 10% of the first loan would be made, that the borrower would supply collateral for twice that amount from the Bank, and that this collateral would be applied to both loans in case of default.

Duran's explanation of what occurred when he presented this letter to the SBA is not in the record. We do have a copy of the letter that was returned by Duran a short time later. The name "Morita" is written in the upper right-hand corner of the letter. There is one hand-written alteration to the effect that the collateral for the second loan will be pledged "by third party". Attached to the letter is an SBA routing slip dated October 20, 1972, indicating that the letter went first to "Morita" and then to "Stu". "Morita" is apparently Gerold Y. Morita, Los Angeles District Counsel for the SBA, and "Stu" is Stewart Rollins, Chief of the Financing Division of the SBA. Written on the routing slip, in what is purported to be Morita's hand, is the message: "Stu, talked to John Duran and he will send a better letter."

1. A certificate of deposit is evidence of a time savings deposit. *Securities & Exchange Comm'n v. Fifth Av. Coach Lines, Inc.,* 289 F.Supp. 3, 31 (E.D.N.Y.1968), *aff'd,* 435 F.2d 510 (2d Cir. 1970).

A second letter was sent to the SBA via Duran on October 30, 1972. It was identical to the first letter except for incorporating the one change mentioned above. The letter is stamped "SBA Received OCT 31 1972" but a large "X" has been drawn across the front along with the inscription "Superseded by letter dated 12/2/72."

The December 2 letter is the third and final letter. It is the cover letter to the official loan proposal for the loan to Diversified Management Corporation, the first of the four loans here in question. Attached to the cover letter was a detailed explanation of the loan and an elaborate delineation of the uses of the loan proceeds. None of these uses included purchases of a certificate of deposit to secure a second loan.

Unlike the first two letters, the cover letter for the actual loan application does not detail the Loss Collateral Plan but says only: "Please be informed that this bank intends to make additional loans to this company now or in the future and/or to obtain guaranties to protect the bank from any loss." In equally ambiguous fashion, the letter explained that the Bank intended to obtain additional unspecified collateral supporting these additional loans and/or guaranties, and that in the event of default "the bank reserves the right to exhaust the collateral supporting these additional loans or guaranties . in whichever manner the bank deems best according to prudent banking practices * * *." This language was apparently proposed by Duran after his conversation with Morita on the first letter.

The Diversified loan application was approved by letter on December 27, 1972. The SBA authorization form incorporated by reference the representations made by the Bank in its application, and, most important, the terms of a blanket "Loan Guaranty Agreement", which the Bank and SBA had entered into on October 30, 1972.

The Loan Guaranty Agreement is a preliminary document which sets forth the ground rules for all subsequent individual loans. 13 C.F.R. § 122.10(b) (1977). Paragraph 1 of the Agreement incorporated by reference the regulations of the SBA, including, of course, the 90% limit on guaranties contained in § 120.2(b)(3).

Along this same line, paragraph 10 specified in part:

"All repayments, security or guaranty *of any nature,* including without limitation rights of setoff and counterclaim, which Lender or SBA jointly or severally may *at any time* receive or have in any guaranteed loan, shall repay and secure the interests of Lender and SBA in the same proportion as such interest [sic] bear respectively to the unpaid balance of the loan * * *." (Emphasis added.)

Paragraph 2 of the Agreement dictated that "[a]ny change in the terms or conditions stated in the loan authorization shall be subject to prior written approval by SBA." Finally, paragraph 10 required the Bank to "notify SBA of any loan or advance by Lender to a borrower subsequent to a guaranteed loan, and if circumstances require, enter into a written agreement with SBA providing for the application of collateral (or proceeds realized therefrom) to the respective loans in a manner satisfactory to the parties hereto."

The Bank's vice president alleges that on January 17, 1973, after the Diversified loan authorization had been issued, but before the funds had been disbursed, he personally visited the SBA office in Los Angeles. He took with him the "complete loan package" for the Diversified loan (or set of loans). He showed it to Morita, who "reviewed the entire file and suggested several minor changes concerning the preparation and manner of execution of some of the loan documents." He also met with the loan officer in charge of that particular account. The loan officer, however, refused to review the file since Morita had already done so.

Subsequently, the Bank entered into three more individual loan agreements substantially identical to the Diversified loan. In March 1973, the Bank and the SBA for undisclosed reasons signed another blanket

Loan Guaranty Agreement identical to the first.

## The Audit

In August 1973, the SBA conducted an audit of the four loans. The audit as noted earlier, revealed the existence and details of the Loss Collateral Plan. Moreover, the audit revealed that the funds to purchase the certificates of deposit were coming one half from the second loan and one half directly from the proceeds of the first, SBA guaranteed, loan.

■ We first note that the Bank was correct in objecting to the admission of the report of the audit into evidence. The audit report was simply attached as "Exhibit B" to the SBA's motion for summary judgment in the court below. It is not signed and the author is unknown. No accompanying affidavit attests to its validity. The audit report thus meets none of the authentication requirements of Fed.R.Evid. 901, 902, or Fed.R.Civ.P. 44, and should have been stricken. *United States v. Dibble,* 429 F.2d at 602. Nevertheless, the error was harmless, for even without the audit report summary judgment was unavoidable.

## Contract Claim

The Bank argues that the Loss Collateral Plan was an approved feature of each of the individual loan contracts. Nonsense. The Bank breached at least three of the four loan agreements by failing to notify the SBA of the subsequent loans. The cover letters said only that the Bank "intends to make additional loans * * * now or in the future and/or obtain guaranties." This obviously falls far short of constituting satisfactory notice. Only with the Diversified loan, where the bank officer took "the complete loan package" to the SBA, can we infer that notice of the second loan was given.

The Bank claims that there was no need for individual notification once the Loss Collateral Plan itself was approved. Yet the only reference to the plan in the contractual documents is contained in these same vague and ambiguous cover letters.

By themselves the cover letters say nothing more than that the Bank might subsequently transact business with these companies and obtain further collateral for future loans. The critical feature of the Loss Collateral Plan is that half the collateral on the future loans was not in fact for those loans at all but was to be exclusively applied to the initial SBA guaranteed loan and only for the benefit of the Bank. The letters carefully avoid reference to this crucial fact.

The only hint of the safety-net arrangement is found in the Bank's suggestion that it will exhaust the collateral on the second loan "according to prudent banking practices." Applying the collateral from one loan to cover liability on an entirely separate loan may indeed be "prudent", but a plan to do so can hardly be said to be implicit in the term.

■ It is true, however, that in interpreting vague and ambiguous contractual language, evidence of the prior negotiations and communications should be considered. *See, e. g., Pacific Portland Cement Co. v. Ford Machinery & Chemical Corp.,* 178 F.2d 541 (9th Cir. 1949); 3 A. Corbin, Contracts §§ 536, 543 (2d ed. 1960 and Supp. 1971). The earlier letters sent to the SBA were undoubtedly more explicit in pointing out the connection between the two loans. The most we can infer from these letters, however, is that someone at the SBA knew generally what the Bank intended. The sparse evidence indicates that the one letter was never read and the other was rejected, though the reasons for that rejection are unclear.

The Bank claims that the vague and ambiguous amendments to the more revealing early letters were the work of the SBA, thereby seeking to avoid the maxim that contractual language will be construed against the drafter. *Distillers Distributing Co. v. J. C. Millett Co.,* 310 F.2d 162, 164 (9th Cir. 1962); 3 A. Corbin Contracts § 559 (1960). The documents themselves, suggest however, that the modifications were the work of the Bank's own agent, Duran, and his lawyer.

■ Even if we assume that the SBA had a hand in suggesting language for the cover letters, the Bank stumbles on yet another important rubric of contract law. A contract is to be interpreted as a whole so as to give meaning to the expressed terms. *Parker v. Commissioner*, 166 F.2d 364 (9th Cir. 1948); 3 A. Corbin, Contracts § 549. The Bank's focus on the cover letters ignores the blanket Loan Guaranty Agreement which forcefully proscribes the taking of any subsequent collateral on a guaranteed loan without pro rata division with the SBA. The Loss Collateral Plan flies in the teeth of this provision. The Bank's efforts to outmaneuver this express requirement are unconvincing. *Cf. Boyajian v. United States*, 423 F.2d 1231, 191 Ct.Cl. 233 (1970).

### Illegality

The Loss Collateral Plan violated the Small Business Act and the SBA's regulations. The Act, 15 U.S.C. § 636(a)(3), and the regulations, 13 C.F.R. § 120.2(b)(2), established the 90% limitation on the SBA's "exposure" under deferred participation loans. The Bank's counter arguments that the SBA has broad powers to draft its own regulations and broad leeway in encouraging loans to small businesses are at best frivolous.

The Bank also asserts that however secure these loans might appear, there is no such thing as a "riskless" loan. It posits as an example the ubiquitous threat of avoidance by a trustee in bankruptcy. This argument misses the point. The statute, regulations, and contract do not require simply that the Bank share some of the risk. They require that the Bank's risk be in propor-

tion to its participation in the loan. This is made even clearer by 13 C.F.R. § 120.-2(b)(3), which, at the time of this contract, prohibited the SBA in its financing agreements from "establish[ing] any preferences in favor of a bank * * *." Whatever dangers the Bank can conjure up as still facing it under the Loss Collateral Plan, they are significantly less than those still faced by the SBA. It is difficult to imagine anything more clearly a preference.[2]

### Estoppel

■ Notwithstanding the illegality of the Loss Collateral Plan, the Bank would have us invoke the doctrine of equitable estoppel on the ground that the Bank relied on the agency's misrepresentation that the scheme was legal. *See generally United States v. Georgia-Pacific Co.*, 421 F.2d 92, 96 (9th Cir. 1970) (four-part test of estoppel); *Russell v. Texas Co.*, 238 F.2d 636, 640 (9th Cir. 1956), *cert. denied*, 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537 (1957). Properly speaking, of course, one cannot estop a party from asserting the illegality of a contract. The court has a duty *sua sponte* to raise the issue in the interest of the administration of justice. *Nyhus v. Travel Management Corp.*, 151 U.S.App.D.C. 269, 466 F.2d 440, 447 (1972). Thus, estoppel of the government in these circumstances becomes merely a subspecies of the general problem of the enforceability of illegal contracts.

■ It has long been true that although a court will not ordinarily allow recovery on an illegal contract, *Hedla v. McCool*, 476 F.2d 1223, 1227 (9th Cir. 1973), the illegality of a contract does not automatically render it unenforceable. Restate-

---

2. The individual loan authorization forms contained the same language, allowing the Bank to make any further conditions on the loans, so long as they were not inconsistent with the terms of the contract and did not establish a "preference" on behalf of the Bank.

We should note that § 120.2(b)(3) has subsequently been amended with the addition of the following language:

"'Preferences' as used herein shall include, but shall not be limited to, (i) any arrangement whereby a participating lender obtains a preferred position over the position of SBA

in the repayment of any SBA participation loan, or in any collateral or any guaranty for said loan; (ii) any requirement for a separate or companion loan to the borrower which results in a preferred position to the participating lender in the repayment or in the securing of repayment of the participation loan; or (iii) any requirement that a borrower purchase a certificate of deposit or maintain a compensating balance which is not under the unrestricted control of the borrower." 13 C.F.R. § 120.2(b)(3) (1977).

ment of Contracts §§ 598–609 (1932); 6A A. Corbin, Contracts, chs. 79–90 (2d ed. 1962); 14 S. Williston, Contracts, chs. 48–50A (3d ed. 1972); 15 S. Williston, Contracts, chs. 51–2. Out of the welter of common law rules regarding illegality has come the general principle that illegal contracts are unenforceable only where (1) a statute explicitly provides that contracts contravening it are void or (2) where "the interest in [the contract's] enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms." Restatement (Second) of Contracts § 320(1) at 53 (Tent. Draft No. 12, March 1, 1977).

▮▮▮ This court anticipated the new Restatement test in cases where a private party seeks to estop the government from asserting the illegality of an arrangement that it had previously condoned or entered into. *United States v. Wharton*, 514 F.2d 406 (9th Cir. 1975); *United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973). Thus, estoppel is available against the government where "justice and fair play require it," *i. e.*, where "the government's wrongful conduct threatens to work a serious injustice and if the public's interest would not be unduly damaged by the imposition of estoppel * * *." *United States v. Lazy FC Ranch*, 481 F.2d at 988–89.[3]

This doctrine has developed despite a strong historical reluctance to hold the government liable for the wrongful acts of its agents. It is premised in part on the belief that the maxim that every man is presumed to know the law (*see, e. g., Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 384–5, 68 S.Ct. 1, 92 L.Ed. 10 (1947)) has less force when one is dependent upon a governmental agency to interpret its own complex body of rules and regulations. *See* K. Davis, Administrative Law § 17.02 (3d ed. 1972). *Cf.* Restatement (Second) of Contracts § 320(2)(a); Restatement of Contracts § 599(b) (1932). Moreover, the in-

creasing presence of the government in the marketplace has necessitated that on occasion it be treated more like a proprietor and less like a sovereign. *United States v. Wharton*, 514 F.2d at 410; *United States v. Georgia-Pacific Co., supra.*

▮▮▮ Nevertheless, the law has not yet accepted the proposition that the government is the same as a private party. Based perhaps partly on the vestiges of sovereign immunity and partly on the belief that the government must rely more heavily upon its agents (*cf. Cooke v. United States*, 91 U.S. 389, 398, 23 L.Ed. 237 (1875)), yet often does not have the firm control of its agents that the private sector does, we still require, as a threshold showing, that to estop the government from raising the defense of illegality one must demonstrate that the agent's action constituted "affirmative misconduct." *INS v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973); *Santiago v. INS*, 526 F.2d 488, 491–93 (9th Cir. 1975) (en banc), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976); *United States v. Wharton*, 514 F.2d at 409–10. *Cf.* Restatement (Second) of Contracts § 320(3)(c), (d).

▮▮▮ Viewed in isolation, certain acts of the SBA come very close to satisfying the required showing: it accepted the vague cover letters; it apparently failed forcefully to reject the first and only clear draft of the plan; and the local counsel allegedly failed to object to the scheme upon his inspection of the first loan file. *Cf. Sun Il Yoo v. INS*, 534 F.2d 1325 (9th Cir. 1976).

But these acts do not reveal the entire picture. This was not a case where the statute and regulations were unclear or where the proposed activity was "arguably legal." *See United States v. Lazy FC Ranch*, 481 F.2d at 990. It is difficult to conceive of a scheme more alien to the loan incentive structure set forth in the Small Business Act. Moreover, the statutory plan of proportional responsibility for the Bank

---

**3.** The principle espoused by *Lazy FC* and progeny on its face leaves no room for the first prong of the new Restatement's test. None of these cases, however, dealt with an explicit prohibition of contracts contravening the statute. We need not decide the issue here, for there is no such prohibition in the Small Business Act.

was sharply and emphatically set forth in the other provisions of the Loan Guaranty Agreement.

In the face of these forceful strictures, the Bank had a responsibility to obtain from the SBA an equally forceful renunciation of them. It did not. At worst, the agency's actions can be characterized as ambivalent. Implications drawn from silences and failures to respond will not, in this situation, suffice. We might also add that we are not dealing with babes in the woods. The president and vice president of the Bank who handled these accounts have been in the banking business a total of almost 60 years.

We find under these circumstances that the SBA did not engage in the "affirmative misconduct" necessary to trigger the *Lazy FC* balancing inquiry.

■ Our holding is also buttressed by the maxim that payments made under contracts which are illegal are not ordinarily recoverable where the parties are *in pari delicto. Danebo Lumber Co. v. Kautsky-Brennan-Vana Co.*, 182 F.2d 489, 493 (9th Cir.), *cert. denied*, 340 U.S. 830, 71 S.Ct. 67, 95 L.Ed. 609 (1950). *See also Hedla v. McCool, supra.* Even under a more sympathetic interpretation than the facts here warrant, the Bank was at best equally at fault. The SBA has paid out its 90%. Whatever monies the Bank has lost are in the hands of creditors other than the agency. No compelling equity requires the government to pay the Bank's share of the loss.

Affirmed.