**Richard J. BEACOM, Plaintiff,**

v.

**The EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, an agency of the United States Government, Defendant.**

**No. CIV 80–307 PHX CAM.**

United States District Court,
D. Arizona.

Aug. 15, 1980.

Thomas C. Horne, Lewis & Roca, Phoenix, Ariz., for plaintiff.

Richard L. Green, E. E. O. C., Phoenix, Ariz., Nicholas Inzeo, Supervisory Atty., E. E. O. C., Washington, D. C., for defendant.

## OPINION and ORDER

MUECKE, Chief Judge.

*FACTS*

Plaintiff, Richard Beacom, moves for a permanent injunction to force defendant, the Equal Employment Opportunity Commission, to employ him in the capacity of trial attorney. The material facts of this case are not in dispute.

Plaintiff is a licensed attorney who has been engaged in the practice of law in Adams County, Colorado, for the past sixteen years. In early February, 1980, plaintiff applied for a position as Trial Attorney with the Equal Employment Opportunity Commission in Phoenix, Arizona.

On March 11, 1980, plaintiff received a telephone call from Ismael Alverez, a supervisory trial attorney for the Commission. Mr. Alverez informed plaintiff that he had been selected to fill the above position, and should report to work in Phoenix on April 7, 1980. Plaintiff explained that he would have to "wind down" his private practice, and asked for more time in which to do so. Mr. Alverez refused, and plaintiff agreed to report as requested.

On March 13, 1980, plaintiff received a letter from the Regional Attorney for the Phoenix District Office of the EEOC confirming his selection and instructing plaintiff to report to work in Phoenix on April 7, 1980.

In reliance on the above conversation, and the written confirmation thereof, plaintiff commenced winding down his legal practice. His efforts included terminating relationships with long–time clients, transferring fee agreements and files, and publishing an announcement in a local newspaper. By the time plaintiff left Colorado, he had completely terminated his legal practice of sixteen years.

On March 14, 1980, after hearing a speech during which President Carter announced an immediate freeze on hiring by federal agencies, plaintiff telephoned Mr. Alverez to inquire whether the freeze would affect plaintiff's job. Plaintiff was informed that it would not and that plaintiff should continue to wind down his practice.

On March 21, 1980, plaintiff received a telephone call from Inez Alverez, the Personnel Manager of the Phoenix District Office. Ms. Alverez informed plaintiff that, because of the freeze, plaintiff's appointment was "on hold." Plaintiff asked Ms. Alverez what it meant to be "on hold;" she replied that it did not mean that plaintiff was not hired. Plaintiff informed Ms. Alverez that he would continue to wind down his practice.

On April 3, 1980, only four days before plaintiff was to report to work in Phoenix, Ms. Alverez telephoned plaintiff in Colorado for the purpose of informing him that his position could not be filled. There was no answer.

Plaintiff reported for work on April 7, 1980, and was instructed that he was not hired.

As a result of the above occurrences, plaintiff finds himself in an unenviable position. He has a license to practice law in Colorado, but .his Colorado practice is in shambles. He has moved to Arizona, but has no license to practice here.[1]

---

1. On April 24, 1980, plaintiff filed an action in this Court in which he requested, among other things, a preliminary injunction and a temporary restraining order compelling the Commission to put him to work. This Court held a hearing on May 2, 1980, at which time it requested the parties to file supplemental memoranda on the issue of irreparable harm. On May 20, 1980, the Court entered an Order directing the parties to inform the Court why it should not make a determination as to whether a permanent injunction should issue in this matter upon the present state of the record. Upon being permitted to supplement the record with additional facts, the parties stipulated to the above procedure. Since May 20, 1980, the parties have been given every opportunity to submit legal memoranda regarding the propriety of a permanent injunction under the above facts. *See* this Court's Orders of May 30, 1980, and June 25, 1980.

*OMB BULLETIN 80–7*

The Government justifies its failure to honor its offer of employment citing Office of Management and Budget Bulletin No. 80–7. That bulletin, received by the EEOC on March 17, 1980, provides as follows:

3. *Limitation on hiring.* The President has directed that each agency in the Executive Branch ... immediately establish controls to limit the number of appointments to full–time permanent positions to not more than 50% of the number of vacancies occurring after February 29, 1980. For the duration of this limitation, the full–time permanent employment base for each agency is the level of employment that existed on February 29, 1980. Thereafter, that base will decrease by 50% of the number of vacancies occurring after that date. A vacancy in existence as of February 29, 1980 (planned positions that were then vacant) may be filled only by use of one of the permitted appointments resulting from new vacancies, i. e., from among the 50% of the number of vacancies occurring after February 29, 1980.

\*　　\*　　\*　　\*　　\*　　\*

4. *Exemptions.* The following exemptions to the limitation are permitted:

\*　　\*　　\*　　\*　　\*　　\*

d. hiring in accordance with firm written commitments by agency personnel officers, made prior to March 1, 1980.[2]

The Government claims that OMB Bulletin 80–7 eliminated all vacancies that existed on February 29, 1980 (where written commitments had not been made by that date) and that the Commission was limited to filling only one vacancy for every two that occurred thereafter. The Government estimates that between March 1, 1980, and

September 30, 1980, (the end of the current fiscal year) 75 positions can be filled pursuant to this limitation.

*APPOINTMENT*

■ Generally speaking, there is no right to work for the public. To have a property interest in Government employment, an applicant needs more than an abstract desire or the ability to perform. *See Coleman v. Darden,* 595 F.2d 533 (10th Cir. 1979); *Love v. United States,* 108 F.2d 43 (8th Cir. 1939). He must have a "legitimate claim of entitlement. . . ." *Coleman v. Darden, supra,* at 539, *quoting Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

Whether Mr. Beacom was "appointed" at the time OMB 80–7 went into effect plays a key role in his ability to challenge the Commission's decision not to honor its employment agreement.[3] In the first place, it is entirely unclear whether OMB Bulletin 80–7, which was issued March 17, 1980, was intended to remove persons who had been appointed prior to that date from their positions in government employment. Moreover, there is much authority to the affect that, once appointed, a public employee may not be removed without being accorded the procedural protections set forth in his agency's own regulations. *See Vitarelli v. Seaton,* 359 U.S. 535, 539–540, 79 S.Ct. 968, 972–73, 3 L.Ed.2d 1012 (1959); *Settle v. Brown,* 345 F.Supp. 405 (S.D.Tex.1972). *See also Toohey v. Nitze,* 429 F.2d 1332 (9th Cir. 1970), *cert. denied, Thomas v. Nitze,* 400 U.S. 1022, 91 S.Ct. 585, 27 L.Ed.2d 633 (1970). *See generally,* 2 Davis, *Administrative Law Treatise,* (2d ed. 1979) § 7:21.

At oral argument, the Court questioned the Government as to the availability of

2. In Mr. Beacom's case, a firm written commitment was not made until March 11, 1980.

3. Mr. Beacom's first argument is that he was "appointed" as of February 28, 1980, and therefore, OMB Bulletin 80–7, which eliminated only those vacancies existing on February 29, 1980, should not be read to apply to him. This position cannot be sustained. *Goutos v. United States,* 552 F.2d 922 (Ct.Cl.1976), discussed *in-*

*fra,* arguably stands for the proposition that a completed Standard Form 52 is the final act required for an appointment. Although an SF 52 has been approved in the present case as of February 28, 1980, it is undisputed that Mr. Beacom's name had not been placed on that form. This Court is aware of no authority that would find an appointment under these circumstances, and can find no rationale for doing so.

administrative review.[4] The Government responded, stating the general rule that an applicant for federal employment has no rights until his appointment. It went on to assert that Mr. Beacom was never formally "appointed," and therefore that he is completely without remedy.

Throughout these proceedings, the Commission has tended to ignore its own role in Mr. Beacom's troubles. Moreover, it has cited no case involving truly similar circumstances.

In support of its contention that the EEOC could, without recourse, withdraw its offer of employment at any time prior to formal appointment, the Government cites cases that deal with promotion and transfer.[5] *See e. g., Vukonich v. Civil Service Com'n,* 589 F.2d 494 (10th Cir. 1978); *Goutos v. United States,* 552 F.2d 922 (Ct.Cl. 1976); *Doggett v. United States,* 207 Ct.Cl. 478 (1975); *Urbina v. United States,* 428 F.2d 1280 (Ct.Cl.1970).

*Vukonich v. Civil Service Com'n, supra,* is illustrative. In that case, plaintiff was employed by the Environmental Protection Agency at a GS–7 level when she was informed that she had been selected to fill a GS–9 opening with the Department of Health, Education and Welfare. Four days before she was to commence her new position, plaintiff was informed that the Civil Service Commission questioned her qualifications for a GS–9 rating, and that her

transfer and promotion would not occur. Plaintiff never began work for HEW, and no Standard Form 50, which is entitled "Notice of Personnel Action," was ever filed. The Court held that plaintiff had not been effectively "appointed" to the GS–9 position, and thus was not entitled to the procedural rights of one facing removal:

> In the paper–laden world of Civil Service, an appointment becomes effective only after a Standard Form 50 ... has been completed.... The reason for the reliance of CSC on Form 50 is set out in the *Federal Personnel Manual.* It provides:
>
>> The Commission requires the preparation of notifications of personnel actions primarily to provide basic documentation of a person's Federal employment, to notify the employee of the personnel action, and to provide basic records which permit agencies and the Commission:
>>
>> (1) To determine the status and rights of employees as well as their eligibilities for promotion, transfer, reemployment, and other personnel actions.
>>
>> (2) To show whether personnel actions authorized or ordered have been effected and *whether actions effected have been authorized.*
>
> . . . . .
>
> The notifications of personnel actions constitute the employee's official record of Federal employment. *They are*

---

4. *See Settle v. Brown,* 345 F.Supp. 405 (S.D. Tex.1972). The Government in the hearing and arguments held before this Court conceded that "if [Mr. Beacom] has been appointed as an employee, then he has a right to go to the protection board." Transcript, May 2, 1980.

5. The decisions cited which do involve original appointment, are not helpful to the present case. In *Gorman v. United States,* 102 Ct.Cl. 260 (1944), it was the plaintiff-employee who requested a finding that he had not been employed (reemployment would have prevented a retirement annuity). The court agreed with plaintiff, primarily because of its finding that the supervisor offering plaintiff his job had "knowingly and purposely withheld" important information regarding what plaintiff's actual salary would be, or at the very least, that there was a "mutual misunderstanding" which had the effect of vitiating the "supposed [reemploy-

ment] agreement." *Id.* at 267. While the court also found that plaintiff's confirmed appointment was not final until approval by the Chief of Engineers and the Secretary of War, which was not done at the time plaintiff rejected his position, there is no indication that the court would have used this to prevent plaintiff from being employed, had the circumstances been different.

The government also cites 18 Comp.Gen. 907 (1939) in which the Comptroller General refused to permit a deputy of a member of the Federal Home Loan Bank Board to receive payment for the two days he served prior to formal approval by the Board. In that case, agency regulations explicitly prohibited entrance on duty prior to Board approval. Moreover, it was not the employee's job that was at stake-it was two days pay.

*the basic source documents by which his rights and benefits under the laws and regulations pertaining to Federal service are determined....* United States Civil Service Commission, *Federal Personnel Manual,* at 296–5 (1969) (emphasis added).

589 F.2d at 496–97.

▌ To a similar effect is *Goutos v. United States,* 552 F.2d 922 (Ct.Cl.1976). In *Goutos,* however, the Court found that approval of a SF 52, "Request for Personnel Action" was the last act necessary to appointment. Plaintiff was a Civil Service employee of the Department of the Army. In 1969, while serving as Deputy Chief, plaintiff was officially detailed to Acting Chief. Although plaintiff's director recommended him for appointment to Chief, the Civilian Personnel Office (CPO) never acted on that recommendation. Plaintiff was eventually redetailed to his former position, and brought suit for retroactive appointment to Chief, and for back pay. The Court saw the issue as "whether plaintiff can claim a valid appointment to . . . Chief . . . absent the CPO's execution of Form 52, officially appointing plaintiff to the position," *id.* at 924, and held that "under the facts of this case, execution of the form is the *sine qua non* to plaintiff's appointment . . . . *Id.* According to the Court,

> it is settled law that a Government employee is entitled only to the rights and salary of the position to which he has been *appointed* by one having the proper authority to do so.

*Id.* The Court went on to observe that it has long been the law that an appointment is not made until the last act re-

quired by the person or body vested with the appointment power is performed. . . . Here the final act required was the signature of the CPO on the form. The CPO never signed, so plaintiff was never appointed.

To infer appointment under these facts could easily bring about chaos in government personnel management. Appointments could take effect automatically, even upon the knowing failure of an appointing official to act. The result would be that the person with the power to recommend would also obtain the power to appoint in direct contradiction of official regulations.

*Id.* at 924–25.[6]

Mr. Beacom's situation differs from the cases cited by the Government in two major respects: first, this case involves original appointment, not promotion; second, while there was never an SF 50 completed in the present case, and while Mr. Beacom's name had never been placed on an SF 52, an SF 52 had been approved by the District Director, Jesus Estrada–Melendez.

Several differences between promotion and original appointment militate against applying the same standards in both situations.

Appointment is more likely to involve negotiation than promotion. Promotions are generally offered and accepted; they require no persuasion. As demonstrated in the present case, appointment may well involve circumstances where the Government will want the services of an individual who is happily employed, and who is willing to

---

**6.** The Court's holding in the present case makes it unnecessary to resolve the issue whether the Form 50 or the Form 52 is the last act necessary to promotion.

On occasion, the Comptroller General has taken the position that even the Form 50 is not enough; that for a promotion to be effective, there must be "acceptance and entrance upon duty after notice of appointment." 45 Comp. Gen. 99 (1965). *See also,* 54 Comp.Gen. 1028 (1975) (dicta). The Court is aware of no judicial decisions that require actual entrance upon duty and finds such a rule is unnecessarily restrictive. Not only is such a requirement

unnecessary to Government personnel management, *see Vukonich v. Civil Service Com'n, supra; Goutos v. United States, supra,* it can work an unfair burden on the prospective Government employee.

It is, however, clear that a Government employee is not entitled to higher pay merely by performing the duties normally performed by a higher- level official; there must be an appointment. *See Peters v. United States,* 534 F.2d 232 (Ct.Cl.1976); *Goutos v. United States, supra; Coleman v. United States,* 100 Ct.Cl. 41 (1943).

give up his employment only if certain conditions are met.[7]

Perhaps the most significant difference between promotion and appointment concerns the potential impact upon the private individual if the Government–employer fails to live up to its end of the bargain. In the cases cited by the Government, the promotee lost only an expectation; when the dust settled his old job was still available. The applicant, as suggested by Mr. Beacom's experience, is not always so lucky. At the time the Government notifies him of its intention to breach, he may well have irreversibly committed himself. He loses not only an expectation, but his old job as well.

Finally, it should be observed that the promotion cases involve present government employees–persons who are more likely to be aware of SF 50's and 52's for the reason that they've been through it before. Unless he is instructed differently, the applicant may react much the same as Mr. Beacom: when the Government assures him, both orally and in writing, that he's employed, he may react as though he has a job.

On March 11, 1980, the Commission, through a supervisory trial attorney, orally informed Mr. Beacom that he had a job. Three days later, the Commission sent him a form letter, signed by the Regional Attorney, with a copy to the District Director. That letter provided, in part:

> we are pleased to confirm your selection to the position of Trial Attorney ... in our Phoenix District Office. The effective date of your *appointment* is April 6, 1980.

> Please report ... on Monday, April 7, 1980 at 8:30 a. m. to complete the necessary appointment papers ....

> We welcome you to our staff and hope that you will find your assignment both challenging and rewarding.

This language does not represent that Mr. Beacom stood a mere chance of being appointed to the position of Trial Attorney. It clearly suggests that an "appointment" had taken place, and that the appointment would become "effective" on April 6th. The reference to "appointment papers," which were not to be filled out until *after* the "effective date" of the "appointment" reinforces this. It suggests that the appointment papers have nothing to do with the effectiveness of the appointment, and that the "last act" necessary to appointment had been completed. *See Goutos v. United States*, 552 F.2d 922 (Ct.Cl.1976).

The Government now argues that such papers were the "sine qua non" to Mr. Beacom's appointment.

The Commission's act in sending the above letter is not alleged to have been the unauthorized act of a single individual. The letter itself appears to be of the form variety, regularly used by the Commission in notifying applicants of their selection.[8] The District Director, to whom the copy was sent, was the same person who approved the SF 52 involved here. The Court concludes that the appointing authority was not only aware that such letters were being used, but was aware that one was sent to Mr. Beacom.

---

**7.** The bargaining that can occur in the employment process is well-illustrated by the telephone exchange taking place between Ismael Alverez and Mr. Beacom on March 11, 1980. Mr. Alverez's refusal to permit plaintiff to report to work after April 7, 1980, after plaintiff had requested additional time to wind down his private practice, could be interpreted as an implied promise to put Mr. Beacom to work if he showed up on the date requested. The Court's holding in the present case makes it unnecessary to address whether Mr. Beacom would have a cause of action for breach of an implied contract to employ, which would be a

difficult question considering the nature of Government employment. *See* text accompanying note 3, *supra*. The Court notes, however, that the Supreme Court has indicated that Government is not immune from the concept of implied contract in employment situations. *See Perry v. Sinderman*, 408 U.S. 593, 601–602, 92 S.Ct. 2694, 2699–2700, 33 L.Ed.2d 570 (1972). *See also United States v. Hopkins*, 427 U.S. 123, 96 S.Ct. 2508, 49 L.Ed.2d 361 (1976).

**8.** The record reveals that a virtually identical letter was sent to Mr. George W. Reyes, another applicant, on March 3, 1980.

■ Under these circumstances, the Court feels justified in finding that Mr. Beacom was appointed as of March 14, 1980. The Commission, following general procedure, represented that the final act necessary to appointment had been completed. *See Goutos v. United States, supra.* Mr. Beacom, in reasonable reliance thereon, acted to his irreversible detriment.

This holding applies only to the narrow facts before the Court. In the cases cited by the Government, the concern has been that unless the "last act" test were followed, the People might be forced to employ personnel that had not been authorized, *see Vukonich v. Civil Service Com'n, supra,* or that "chaos in government personnel management" would result. *See Goutos v. United States, supra.* These problems are not present here. The only administrative burden that this ruling places on the government is to require agencies to use procedures that fairly appraise an applicant of his standing.

*ESTOPPEL*

The Court need not base its holding entirely on the conclusion that Mr. Beacom was in–fact "appointed." Under the circumstances presented here, the Government should be estopped from asserting that Mr. Beacom has no rights to appointment.

The Commission's course of dealing with Mr. Beacom permits two estoppel arguments, either of which would provide a basis for relief. The most obvious argument is that the Commission's failure to inform Mr. Beacom that he was not protected by a formal appointment, combined with its misleading confirmation, should estop the Commission from asserting that appointment had not occurred. In addition, it could be argued that, under the circumstances, the Commission's delay in informing Mr. Beacom that the President's freeze would affect his job should estop it from applying OMB Bulletin 80–7 to Mr. Beacom.

■ In general, the appropriate test of estoppel in this circuit is as follows:

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.

*United States v. Georgia Pacific*, 421 F.2d 92, 96 (9th Cir. 1970). *See also Simon v. Califano*, 593 F.2d 121, 123 (9th Cir. 1971); *United States v. Ruby Co.*, 588 F.2d 697, 703 (9th Cir. 1978); *United States v. Wharton*, 514 F.2d 406, 412 (9th Cir. 1975).

■ Where the Government is the party against whom estoppel is being asserted,[9] however, it is clear that the private litigant must do more than meet the general test. Not only must the private litigant make a threshold showing that the Government has engaged in "affirmative misconduct," *see Oki v. Immigration and Naturalization Service*, 598 F.2d 1160 (9th Cir. 1979); *Simon v. Califano, supra; United States v. Ruby Co., supra; California Pacific Bank v. Small Business Administration*, 557 F.2d 218 (9th Cir. 1977); *Sun Il Yoo v. Immigration and Naturalization Service*, 534 F.2d 1325 (9th Cir. 1976); *Santiago v. Immigration and Naturalization Service*, 526 F.2d 488 (9th Cir. 1975), he faced the further burden of demonstrating that the injustice caused by the Government's misconduct is sufficiently severe to outweigh the countervailing interest of the public not to be unduly damaged

---

**9.** The traditional view was simply that the federal government could not be subjected to estoppel. *See Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1917). Recently, however, the Ninth Circuit has recognized that the Government should not be immune from estoppel under all circumstances. This retreat from traditional thought

    is premised in part on the belief that the maxim that every man is presumed to know

the law ... has less force when one is dependent upon a governmental agency to interpret its own complex body of rules and regulations. Moreover, the increasing presence of the Government in the marketplace has necessitated that on occasion it be treated more like a proprietor and less like a sovereign.

*California Pacific Bank v. Small Business Administration*, 557 F.2d 218, 224 (9th Cir. 1977).

by the imposition of estoppel. *United States v. Ruby Co.*, 588 F.2d at 703; *United States v. Wharton*, 514 F.2d at 411.[10]

## AFFIRMATIVE MISCONDUCT

The question whether the Commission's behavior in the present case amounts to "affirmative misconduct" is troublesome. While frequently voicing the need for affirmative misconduct, the Ninth Circuit has avoided formulating a standard with which to determine its existence. The court has tended to look at the facts of each case and announce whether, under those circumstances, the Government is sufficiently blameworthy. *See e. g., California Pacific Bank v. Small Business Administration*, 557 F.2d at 224–25; *Sun Il Yoo v. Immigration and Naturalization Service*, 534 F.2d at 1329.

The present fact situation gives rise to three possible sources of misconduct:

First, the Commission failed to inform plaintiff that its job offer, plaintiff's acceptance thereof, and the Commission's subsequent written confirmation would not, under the standards presently asserted by the Government, give rise to a firm appointment until various Government forms had been signed and approved and plaintiff had actually commenced employment. The Commission's failure in this regard kept plaintiff ignorant of the risk he was taking by winding down his practice.

Second, as discussed previously, the Commission's written confirmation of plaintiff's employment gives the definite impression that a valid appointment had taken place, and that the "appointment papers" (presumably those now relied upon by the Commission as conditions precedent to appointment) could be taken care of after the effective date of the appointment.

The final source of possible misconduct concerns the Commission's delay in informing plaintiff that he would not be hired. There were 19 days between the President's speech and the Commission's attempted call on April 3, 1980. The call wasn't attempted until 16 days after the Commission's receipt of OMB Bulletin 80–7 and 12 days after the Commission knew enough to place plaintiff "on hold." The foregoing delay should be examined in light of the Commission's awareness of plaintiff's reliance and its awareness of the extent of damage that would result from not honoring its employment commitment.

### a) Nonfeasance

The Ninth Circuit's recent decision in *Oki v. Immigration and Naturalization Service*, 598 F.2d 1160 (9th Cir. 1979), suggests that the private litigant who wishes to subject the Government to estoppel must do more than prove misconduct; he must also prove that the Government's misbehavior was "affirmative." While it is clear that the Commission's written confirmation was affirmative conduct, the same is not true of its other behavior.

In *Oki*, the Government sought to deport an alien for the reason that he had commenced employment in this country without receiving permission. Petitioner argued that the Government should be estopped from asserting lack of permission because the Government had failed to advise petitioner of this requirement. The Court, relying on *United States v. Ruby Co.*, 588 F.2d at 703–04 and *Santiago v. Immigration*

---

10. The Commission argues that the policy in favor of Government independence in personnel decisions, *see Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), should preclude the availability of estoppel in all cases of this nature. The Court cannot agree. The Ninth Circuit has considered estoppel in various areas of government concern, *see e. g., United States v. Wharton, supra*, (acquisition of government land); *Sun Il Yoo v. Immigration and Naturalization Service, supra* (immigration); *California Pacific Bank v. Small Business Administration, supra* (government contracts), but has never found a particular Government interest so overriding as to completely bar the application of estoppel in a meritorious case. The interests of the people have been, and can be, adequately protected on a case–by–case basis by balancing the equities alleged by the private litigant against the interests asserted by the Government. *See United States v. Ruby Co., supra.* It is unnecessary to ignore the interests of the private litigant and the behavior of the Government and to decide the issue simply on the basis of the subject matter involved.

*and Naturalization Service*, 526 F.2d at 491, found an absence of affirmativeness:

> But it is not the failure to do something which may lead to estoppel against a government agency; the conduct complained about must be an affirmative act.... The failure to advise Mr. Oki that he could not work until permission was received subsequent to filing the necessary forms was clearly not affirmative conduct. We need not reach the question of whether such conduct could ·be considered misconduct as required for an estoppel against the government.

598 F.2d at 1162 (Citations omitted).

Upon review of the cases relied upon by *Oki*, as well as other Ninth Circuit decisions in this area, this Court concludes that the *Oki* decision did not intend to preclude estoppel in all cases where the misconduct of the Government could be cast in terms of nonfeasance.

One of the first Ninth Circuit decisions to discuss the Supreme Court's use of there term "affirmative misconduct" in *Immigration and Naturalization Service v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973), was *Santiago v. Immigration and Naturalization Service, supra*. In *Santiago*, aliens argued that Immigration's failure to inform them of certain statutory requirements for entry, after learning ̇the relevant facts, should estop the Government from asserting ineligibility at a subsequent deportation hearing. The court rejected the alien's argument, but specifically declined to elaborate on the meaning of "affirmative misconduct" or to speculate as to why the Supreme Court chose the modifier "affirmative." While the court detected a suggestion that "a distinction might be drawn between nonfeasance and misfeasance,"̣526 F.2d at 493, it announced that such terms are "slippery." *Id.*[11]

*United States v. Ruby Co., supra,* the second decision relied on by *Oki,* involved a land dispute between the federal government and the successors in title to a land patent holder. In that case, the court held that the Government's failure to resurvey certain land upon learning of an investigation by the Bureau of Land Management which concluded that the survey pursuant to which the patent was issued was fraudulent should not estop the Government from asserting the incorrectness of the survey some 35 years later. While the court reaffirmed the position of *Santiago, supra,* that the misconduct of the Government must be "affirmative," 588 F.2d at 703, the court's ruling had little to do with affirmativeness. The fraudulent nature of the original survey was insufficient for lack of evidence that the Government, after becoming aware of the inaccuracies, ever sought to conceal or to misrepresent the true facts. The Government's decision not to resurvey was termed "affirmative conduct," 588 F.2d 704, but the court found "it is clear that it was not *misconduct.*" *Id.* (Emphasis in original).

The Ninth Circuit's most extensive examination in this area suggests that under appropriate circumstances Government *in*action can meet the affirmativeness requirement. In *Sun Il Yoo v. Immigration and Naturalization Service,* 534 F.2d 1325 (9th Cir. 1976), the court held that a ten-month delay by the Government in ascertaining the veracity of information alleged in an alien's application for a visa was sufficient to estop the Government from asserting that eligibility regulations had changed in the interim. In making its determination, the court looked to the surrounding circumstances and found "no apparent justification" for the delay. *Id.* at 1328. The court distinguished *Santiago, supra* on two levels. First, that case involved

---

11. The Court noted that the Government's failures can become misfeasance simply by characterizing them as "deliberate efforts," 526 F.2d at 493, and that the problem can become "semantic." *Id.*

The *Santiago* decision is not particularly helpful for the reason that it declined to explain why the Government's behavior did not amount to *affirmative* misconduct. The court simply compared the "misconduct" involved in *INS v. Hibi, supra,* with the behavior before it and found the latter to be "less blameworthy." 526 F.2d at 493.

a failure to inform which "may have been due to simple negligence resulting from the hectic atmosphere surrounding the processing and admitting of large numbers of aliens . . . ." *Id.* Secondly, the injury in *Sun Il Yoo* was more severe:

> When such serious injury may be caused by INS decisions, its officials must be held to the highest standards in the diligent performance of their duties. Here, their duty was clear. Unlike the immigrants in Santiago, who had no right to enter the United States when they did, Yoo had an absolute right to a labor certification under the INS's own regulation. INS officials, by their *affirmative inaction*, deprived petitioner of that right without justification.

*Id.* at 1329. (Emphasis supplied).[12]

■ This Court feels that whether nonfeasance by the Government is simply inaffirmative, or amounts to "affirmative inaction" should be viewed with reference to the circumstances of each case. Since *Oki v. Immigration and Naturalization Service, supra,* failed to mention *Sun Il Yoo,* it seems reasonable to assume that the court did not intend to detract from that decision.

**b) Misconduct**

In determining whether a given set of circumstances amounts to affirmative misconduct, the Ninth Circuit has tended to emphasize three factors:

First, the Government's justification for its alleged misbehavior, *see Sun Il Yoo v. INS, supra,* at 1328; *United States v. Ruby Co., supra* at 704;

Second, the magnitude of injury possible from breech of duty, *see Sun Il Yoo v. INS, supra* at 1329. *Cf. Simon v. Califano,* 593 F.2d at 123; and

Third, the harm to the public from permitting estoppel. *See California Pacific Bank v. SBA, supra* at 225; *United States v. Ruby Co., supra* at 700, 704; *Sun Il Yoo v. INS, supra* at 1329.

In the present case, the Court can find little justification for the Government's failure to inform Mr. Beacom that his appointment would not be considered until his paperwork was approved and he had commenced his duties,[13] or for its delay in informing Mr. Beacom that the President's freeze would affect his job.[14] This is espe-

---

**12.** Since *Sun Il Yoo,* the court has consistently looked to surrounding circumstances to determine whether arguably nonfeasant government behavior amounted to affirmative misconduct.

In *California Pacific Bank v. Small Business Administration,* 557 F.2d 218 (9th Cir. 1977), the court held that the Government's failure to assert the illegality of certain loan arrangements was insufficient to estop it from asserting illegality of contract. The court noted that the Bank's allegations, "viewed in isolation . . . [came] very close to satisfying the required showing," 557 F.2d at 224, but that these allegations did not reveal the entire picture. The court reasoned that *in view of the fact that the disputed provisions were clearly illegal*

> the Bank had a responsibility to obtain from the SBA an equally forceful renunciation of them . . . Implications drawn from silences and failures to respond will not, *in this situation,* suffice.

*Id.* at 225. (Emphasis added).

In *Simon v. Califano,* 593 F.2d 121 (9th Cir. 1979), the court was dealing with a combination of misfeasant and arguably nonfeasant behavior. In that case, the negligence of a trainee claims representative in failing to ask a retirement insurance claimant whether she had children, and in writing "none" in response to a

question on the claim application concerning eligible children was held not to estop the Government from arguing that a substantive condition to benefits is an application therefore. The court found that the trainee was guilty of negligence, but that "mere neglect of duty" does not amount to affirmative misconduct. As a further reason for its decision, the court found that plaintiff's loss was "not of such magnitude and so serious" as to warrant estoppel under the circumstances. 593 F.2d at 123.

**13.** In *Sun Il Yoo v. INS, supra,* the court distinguished failures to act which "may have been due to simple negligence resulting from [a] hectic atmosphere," 534 F.2d at 1328, from those where the Government had time to think. In the present case, the Government's failure to inform appears to have been a matter of standard procedure, *thereby placing it in the latter category.*

**14.** In *Sun Il Yoo v. INS, supra,* the court found that under appropriate circumstances, the Government's failure to act could amount to "oppressive delay," constituting "affirmative inaction." 534 F.2d at 1328–29. While the delay in *Sun Il Yoo* was more substantial than

cially so in light of the Commission's knowledge that Mr. Beacom was dismantling 16 years of private practice in reliance on his appointment, and Mr. Beacom's phone call requesting information on whether his appointment was in jeopardy. It is noteworthy that EEOC hires many lawyers, and must be presumed to know the harm that a breach of duty would visit on Mr. Beacom's life and profession.

In addition to the above, the Court finds little harm to the public in permitting estoppel in the present case. This is not a case where the people stand to lose thousands of acres of land, see *United States v. Ruby Co., supra* at 700, or where estoppel will tolerate the Government's participation in a clearly illegal contract, see *California Pacific Bank v. SBA, supra.* In the present case, the plaintiff is asking the Government to accept an experienced trial lawyer who the Commission had chosen of its own free will. Moreover, the Government cannot claim that estoppel will require it to violate the Presidential freeze. The Government admits that, even under OMB Bulletin 80–7, the Commission would be able to hire 75 persons between March 1, 1980, and September 30, 1980.

Under the present circumstances, the only harm that can be asserted by the Government is that estoppel will force the Commission to fill a position that, under its priority schedules, the Commission might otherwise choose to leave open.[15] It should be noted that, to the Court's knowledge, the Government has not even attempted to avoid this injury by offering Mr. Beacom the opportunity to fill any of the openings that have occurred regardless of where they are located even though the Court suggested such a procedure in an attempt to achieve a settlement of this case.

■ The Court finds that the Commission's failure to inform plaintiff that he was not operating under the protection of an appointment, its written confirmation, which suggested that plaintiff had in fact been appointed, and its delay in informing plaintiff that he would not be hired, each constitute sufficient "affirmative misconduct" to permit the Court to proceed to the balancing stage of the analysis.

*CONCLUSION*

This Court is fully aware that estoppel against the federal government is still the exception rather than the rule. See *California Pacific Bank v. SBA*, 557 F.2d at 224. The present facts, however, demand relief. Not only should the Commission be estopped from asserting that appointment had not occurred, it should be estopped from applying OMB Bulletin 80–7 to Mr. Beacom. The Court reaches this conclusion only after carefully balancing the injustice[16] caused by the Government's miscon-

here, the Government's knowledge of Mr. Beacom's predicament and the irreparable nature of resulting harm renders the situation "oppressive."

15. Plaintiff is not alone in his disappointment. The Government alleges that between March 1, 1980, and March 17, 1980, (the date the EEOC received OMB Bulletin 80 -7), the Commission had made 116 written commitments of employment. The Commission's solution was to rescind all outstanding offers; to establish a Vacancy Control Board, composed of high Commission officials; and to hire only after the Board had reviewed a position in light of program priorities.

16. The issue of whether plaintiff would suffer sufficient irreparable harm to warrant a Temporary Restraining Order was argued on May 2, 1980. At that time, the Court noted that *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937,

39 L.Ed.2d 166 (1974), weighed heavily against plaintiff's position, although it did not preclude such a finding entirely. *Id.* at 92, 94 S.Ct. at 953, n. 68. The question was not decided, however, because the parties agreed to the Court's suggestion, pursuant to Rule 65(a)(2), to an expedited review of the merits of the case. See this Court's Order of May 20, 1980, and the Statement as to Agreement of the Parties Regarding the Court's Order Dated May 20, 1980, filed May 27, 1980. On June 2, 1980, the Court ordered that the parties submit "legal memoranda as to the appropriateness of a permanent injunction under the facts of this case (memoranda previously submitted have been limited to the issue whether preliminary relief was appropriate and are thus not directly applicable to the question now before the Court)." The Commission did not thereafter address the issue of irreparable harm--even though plaintiff's Response to Defendant's Legal Memorandum

duct against the countervailing interests of the public not to be unduly damaged by the imposition of estoppel. *See United States v. Ruby Co.*, 588 F.2d at 703; *United States v. Wharton*, 514 F.2d at 411.

Throughout this matter, the Court has encouraged the Government to find a place for Mr. Beacom, but the Government has refused to do so. Such action would have made this difficult decision unnecessary.

In accordance with the foregoing, this Court finds that Mr. Beacom was employed by the Commission in the position of Trial Attorney on April 7, 1980.

Therefore,

IT IS ORDERED that plaintiff be given all the perquisites of said employment, including accrued pay, seniority, and other benefits, from April 7, 1980.

and Proposed Findings of Fact, filed June 17, 1980, pointed out that "although the Court's Order appears to call for authorities as to the standards on permanent injunction, that question is not discussed." On June 27, 1980, the Court entered an Order permitting the parties to reply. Still, the Commission did not address the issue of irreparable harm. This Court finds that, under the circumstances, the Government's failure to address this issue amounts to a concession that, if Mr. Beacom is denied an injunction, he will suffer irreparable damage. *See* Rule 11(g), Local Rules of Practice for the United States District Court, District of Arizona.